**WESTERN FUELS–UTAH, INC., Petitioner,**

v.

**FEDERAL MINE SAFETY & HEALTH REVIEW COMMISSION and the Secretary of Labor, Mine Safety & Health Administration, Respondents.**

No. 88–1313.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 29, 1988.

Decided March 24, 1989.

Karl F. Anuta, Boulder, Colo., with whom Frederick L. Miller, Jr. and Jeffery N. Luthi were on the brief, for petitioner.

Linda L. Leasure, Atty., Dept. of Labor, with whom George R. Salem, Sol. of Labor, and Dennis D. Clark, Counsel, Dept. of Labor, were on the brief, for respondents. L. Joseph Ferrara, General Counsel, Federal Mine Safety & Health Review Com'n, Washington, D.C., also entered an appearance for respondents.

Before MIKVA and D.H. GINSBURG, Circuit Judges, and ROSENN,* Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

Petitioner Western Fuels–Utah petitions for review of an order issued by respondent Federal Mine Safety and Health Review Commission requiring Western to pay a penalty pursuant to the Federal Mine

* Of the United States Court of Appeals for the Third Circuit, sitting by designation pursuant to

28 U.S.C. § 294(d).

Safety and Health Act of 1977 (the Mine Act). We deny the petition for review.

## I. Facts

The facts are undisputed. On February 28, 1986, Austin Mullens, a miner, was killed in a mine operated by Western when an unsupported portion of the mine's roof fell on him. A sufficient understanding of the facts of this case therefore requires a brief digression into the esoterica of mine safety, as we understand it from the record in this case.

In order to keep an underground mine passage from collapsing, the roof of the passage must be supported. In the mine in which Mullens met with his accident, the support was provided by roof bolts, long steel rods forcibly inserted into holes drilled in the roof. The roof, which is divided into horizontal strata, is thus strengthened, both by the binding together of a number of different strata and by the anchoring of the thin, lower strata to a stronger stratum above.

The insertion of the bolts into the roof is accomplished by a roof-bolting machine. The particular type of roof-bolting machine in use at the time of the accident has two arms or booms. Standing under a supported portion of the roof, two miners (one on each boom) place a flat metal pan the width of the underground passage on the booms. The machine is then moved forward (whilst the miners stay under the supported part of the roof), and the booms raise the pan to the previously unsupported roof, thereby providing temporary support for it. The miners can then safely stand under the roof in order to drill the holes and insert the bolts that will constitute its permanent support.

On the day of the accident, Mullens and his section foreman, Carson Julius, were operating such a roof-bolting machine. In the course of their activities, they put the metal pan in place temporarily to support the roof and proceeded to drill. When Julius's hydraulic drill stopped working because of a kink in a water line attached to it, Mullens and Julius lowered the booms and moved the roof-bolting machine back under the permanently supported portion of the roof, which caused the metal pan to fall to the ground.

After correcting the problem with his drill, Julius, standing under the supported part of the roof, used a four foot long steel rod in an attempt to raise the pan so that it could be placed back on the booms. He soon realized that he would need a longer rod and went to get one, warning Mullens as he did so not to go under the unsupported portion of the roof.

Nonetheless, while Julius was nearby getting the longer rod, Mullens went out under the unsupported roof and attempted to raise the pan with his hands. When Julius noticed what Mullens had done, he twice yelled to Mullens to get out from under the unsupported portion of the roof. Before Mullens responded, a portion of the unsupported roof collapsed, and he was killed.

The Mine Safety and Health Administration investigated the accident and cited Western for a violation of § 104(a) of the Mine Act, 30 U.S.C. § 814(a) (1982). The basis for the citation was 30 C.F.R. § 75.200, which provides in part:

> No person shall proceed beyond the last permanent support unless adequate temporary support is provided or unless such temporary support is not required under the approved roof control plan and the absence of such support will not pose a hazard to the miners.

The approved roof control plan at Western's mine permits a miner to go beyond the last permanent support only if he is installing temporary support. Therefore, Western does not dispute that Mullens was in fact not in compliance with § 75.200 when he was killed.

Western contested the citation on legal grounds, but an Administrative Law Judge held that Western was liable for violating § 75.200. The ALJ also found, however, that the resulting accident was due to Mullens's negligence, which Western could not have foreseen; that Western had properly supervised Mullens; that Western's record for training and disciplining miners who

failed to comply with safety standards was adequate; and that Western was not negligent in connection with Mullens's death.

In finding Western liable nonetheless, the ALJ reasoned that the Mine Act contemplated liability without regard to whether the operator was at fault, and that the absence of any negligence on Western's part, while relevant to the amount of the penalty to be assessed, was irrelevant to the finding of whether a violation had occurred. The ALJ therefore upheld the citation. The Commission, in turn, affirmed the ALJ. Western then petitioned this court for review of the Commission's decision.

## II. ANALYSIS

Western's argument is straightforward: properly interpreted, the Mine Act does not authorize the imposition of any penalty upon an operator who has not been at least negligent. The Commission, with equal directness, contends that the Mine Act imposes a regime of strict operator liability, reflected in the terms, the legislative history, and the purposes of that statute. We conclude that the Commission is clearly correct insofar as it interprets the Mine Act to make an operator liable for the acts of another. Because the actor in this case, Mullens, was at fault, however, we need not and do not resolve the issue of whether an operator is liable for the act of another where neither was at fault.

### A. *Vicarious, as Opposed to Strict, Liability*

As the parties argue this case, we are presented with the question whether the Mine Act imposes strict (as opposed to negligence) liability. That characterization of the issue is not entirely accurate, however. The narrower question actually presented is whether an operator may be held vicariously liable for the willful violation of the Mine Act by a rank and file miner.

The general rule of both civil and criminal responsibility is that a person is not liable for a harm done unless he caused it by his action (*actus reus*), and did so with a certain intent (*mens rea*). Strict liability

alters this general rule by eliminating the requirement of *mens rea;* one may then be punished for acting in a forbidden way, even if one was without any particular intent, such as willfulness or negligence. A familiar example is the strict liability of an enterprise for the consequences of its ultrahazardous activity, such as the use of explosives. Vicarious liability, on the other hand, alters the general rule by holding a person liable for the act of another—that is, by attenuating the requirement of an *actus reus*. A familiar example here is the liability of one coconspirator for the act of another within the scope of the conspiracy.

Vicarious liability may be imposed with or without regard to the intent of the actor; in the latter case, which combines strict and vicarious liability, one person is held liable for an act of another who was not at fault. An innkeeper, for example, may be liable, both civilly and criminally, for serving an alcoholic beverage to a minor even if he has taken action to ensure that minors not be served in his establishment, was unaware that a minor was being served, and could not, in the exercise of reasonable care, have stopped the minor from being served. *See* W. LaFave and A. Scott, *Criminal Law* 224–25 (1972). To be sure, in such circumstances the innkeeper may receive a lesser criminal penalty because he is not at fault (just as Western was assessed a lower civil penalty in this case because it was not at fault), but that does not change the fact that he has violated the law.

The Commission argues that the Mine Act creates just such a regime of strict, vicarious liability, and as we will discuss, it does appear that the Commission is correct. Nevertheless, the strict liability question is not presented here, and we do not decide it. *See International Union, United Mine Workers v. FMSHRC,* 840 F.2d 77, 84 n. 14 (D.C.Cir.1988). For it is undisputed that Mullens did take a forbidden action (*actus reus*), and that he did so with the requisite *mens rea* (negligence). *See* above at p. 712. Whether Western can be held *vicariously* responsible for Mullens's act is therefore the narrow issue properly before us.

B. *The Liability Scheme of the Mine Act*

When faced with a challenge to an agency's interpretation of its enabling statute, the office of this court is to determine whether the statute in question is ambiguous, and only if so, whether the interpretation put forward by the agency "is based on a permissible construction of the statute." *Chevron U.S.A. v. NRDC,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). Because we conclude that the statute unambiguously requires a regime of vicarious liability, we end our analysis there and affirm the Commission's interpretation of the Mine Act without recourse to *Chevron's* second step.

This dispute revolves primarily around two sections of the Mine Act, to wit, § 104, 30 U.S.C. § 814:

(a) If, upon inspection or investigation, the Secretary or his authorized representative believes that an operator of a coal or other mine subject to this chapter has violated ... any mandatory health or safety standard ... promulgated pursuant to this chapter, he shall, with reasonable promptness, issue a citation to the operator....

   \*   \*   \*   \*   \*   \*

(d)(1) If, upon any inspection of a coal or other mine, an authorized representative of the Secretary finds that there has been a violation of any mandatory health or safety standard, and if he also finds ... [*inter alia,*] such violation to be caused by an unwarrantable failure of such operator to comply with such mandatory health or safety standards, he shall include such finding in any citation given to the operator under this chapter....

and § 110, 30 U.S.C. § 820:

(a) The operator of a coal or other mine in which a violation occurs of a mandatory health or safety standard ... shall be assessed a civil penalty by the Secretary, which penalty shall not be more than $10,000 for each such violation....

   \*   \*   \*   \*   \*   \*

(i) The Commission shall have authority to assess all civil penalties provided in this chapter. In assessing civil monetary penalties, the Commission shall consider ... whether the operator was negligent....

1. *Whence the Liability?: Section 104(a) versus Section 110(a)*

The parties are at odds over which of the above-quoted sections is the source of an operator's liability. Western contends that § 104 imposes liability, if any, and that § 110 is concerned merely with the magnitude of the penalties that may be imposed for a violation of § 104. Specifically, the requirement of § 104(a) that the Secretary find, prior to imposing a penalty, that "an operator ... has violated" a mandatory safety standard implies, according to Western, that an operator that has done nothing does not violate the Act, *i.e.,* that the Act does not impose vicarious liability upon an operator for the acts of a miner.

The Commission champions § 110 as the provision under which an operator's liability is to be determined, and argues specifically that § 104(a) merely "sets forth the duties of mine inspectors in enforcing the Mine Act. It does not define the scope of the operator's liability." *Western Fuels–Utah,* 10 FMSHRC 256 (1988) (quoting *Asarco, Inc.—Northwestern Mining Dep't.,* 8 FMSHRC 1632 (1986), *aff'd, Asarco, Inc. v. FMSHRC,* 868 F.2d 1195 (10th Cir.1989)). Because § 110(a) provides that a penalty may be imposed when "a violation occurs of a mandatory health or safety standard" in the operator's mine, the Commission argues that the statute expressly establishes a scheme under which an operator may be held liable for the act of another, *i.e.,* a scheme of vicarious liability.

The Commission's argument that § 104(a) sets out no more than the duties of mine inspectors is unconvincing. To accept that argument would leave no basis on which to reject the parallel argument that § 110 merely sets out the duty of the Secretary to assess penalties against violators. There then would be *no* provision in the Mine Act establishing an operator's liability

for a violation, which would surely be a surprise to the Congress that enacted it. The Commission's claim that § 110 is the relevant provision seems especially maladroit where, as here, the MSHA citation that gave rise to this litigation purports to be based upon § 104(a) and never mentions, even in passing, § 110. Moreover, the whole of § 110 is devoted to penalties: civil penalties, liability of officers and directors, criminal penalties, etc. 30 U.S.C. §§ 820(a), (b), (c), and (d). Section 104, on the other hand, is concerned with citations for violations of various standards. 30 U.S.C. §§ 814(a), (b), and (d). These observations all tend to support Western's interpretation of the statute, *i.e.*, that § 104 imposes the relevant standard of liability.

Western's contention that § 104 governs is not without its problems, however. . In particular, the House conferees discussed the issue of the appropriate standard of liability in their analysis of the predecessor to § 110 in the Federal Coal Mine Health and Safety Act of 1969 (the Coal Act), which strongly suggests that they understood (what is now) § 110 to be the liability provision. H.R.Rep. No. 91–761, Statement of the Managers on the Part of the House, 91st Cong. at 71, *reprinted in Legislative History of the Federal Coal Mine Health and Safety Act of 1969, Vol. I* at 1515 (1975).

If the determinative question in interpreting the statute with regard to vicarious liability were which provision is its locus of liability, we would have to say that the statute is ambiguous, indeed obscure, and proceed to *Chevron*'s second step. Our first step inquiry into the clarity with which Congress has spoken does not, however, end with the parties' jejune quibble over whether § 104 or § 110 is the locus of liability under the Mine Act. In order to determine whether the Act embodies a standard of vicarious liability, we must examine not a particular section divorced from its context, but the Mine Act as a whole, including § 104 and § 110, as well as other provisions with which they interact.

## 2. *Vicarious Liability in the Context of the Mine Act as a Whole*

We begin our journey through the statutory scheme with the observation that, in the parlance of the Mine Act, only an "operator" can commit a "violation." An "operator" is "any owner, lessee, or other person who operates, controls, or supervises a coal or other mine or any independent contractor performing services or construction at such mine," 30 U.S.C. § 802(d) (1982); clearly, a rank and file miner does not fall within the statutory definition of an "operator." The § 104(a) standard therefore cannot answer the question presented in this case—whether a miner's actions may be imputed to the operator so that the employer can be said to "ha[ve] violated" a safety standard based upon the employee's act. The standard of § 110(a) is similarly unilluminating: whether a "violation has occurred" under that section depends entirely on whether Western is vicariously liable for Mullens's act. Because both § 104(a) and § 110(a) use the term "violate" or a variant without definition, neither section answers the question of what it means to "violate" the Act, in the sense of whether an operator is vicariously liable for the non-compliance of a miner. Congress's interchangeable use of the two phrases (whether an operator "has violated" and whether a "violation has occurred"), to the point of using them both in the same section of the Mine Act, *compare* § 104(a) *with* § 104(d), is further evidence, if any is necessary, that Congress did not intend for any distinction with substantive consequences to depend upon the linguistic variations upon which the parties here focus.

To say that neither § 104(a) nor § 110(a) is unambiguous in its import is not to say that the Mine Act as a whole is ambiguous on the issue of vicarious liability. In addition to the clauses just discussed, the relevant sections of the Mine Act include two provisions—§ 104(d) and § 110(i)—that resolve any doubt about Congress's intent. Section 104(d) provides in part that if the Secretary finds that a violation has been "caused by an *unwarrantable* failure *of [the] operator* to comply with such manda-

tory health or safety standards ...," 30 U.S.C. § 814(d) (emphasis added), a finding of greater significance is indicated on the citation, and the possible penalties for certain future violations become much more severe. Section 104(d) thus draws two distinctions: first, between unwarrantable and other failures to comply with safety standards, and second, between failures of compliance by the operator and those of persons other than the operator. It is the second distinction that concerns us here. By contrasting the acts of the operator and those of another, and providing for a greater penalty where the operator's act causes the failure of compliance, the statute necessarily implies that a violation can exist even without an act on the operator's part; the statute simply evinces Congress's heightened concern for violations that are attributable to an act of the operator. This implication is strengthened when it is seen that where the framers of the Mine Act intended to preclude a similar inference from the terms of the statute, they explicitly so indicated. *See* S.Rep. No. 95–181, 95th Cong. at 23 (1977), U.S.Code Cong. & Admin.News 1977, pp. 3401, 3423 ("The [Mine Act] uses the phrase 'mandatory health or safety standard' because this is a defined term under the Coal Act and this bill. The use of the term 'mandatory standard' should not be interpreted to mean there also will be non-mandatory standards.").

Furthermore, § 110(i) requires the Commission to consider, in determining the amount of the penalty to be imposed under § 110(a), "whether *the operator* was *negligent*." 30 U.S.C. § 820(i) (emphasis added). Again, this rule draws two distinctions: first, between negligent and non-negligent violations, and second, between violations attributable to an act of the operator and those attributable to an act of another. The latter distinction again necessarily implies that the operator can be held liable even for the acts of others, *i.e.*, that the Mine Act embodies a standard of vicarious liability.

It might be thought that the import of the above-quoted language is not to create a system of vicarious liability, but rather one of strict liability—that is, that our emphasis in reading the quoted passages should be not on "the operator" but on "unwarrantable" as opposed to other operator acts in § 104(d), and on "negligent" as opposed to other operator conduct in § 110(i). Were the strict liability issue presented here, we would be hard pressed to conclude other than that, by the use of these terms, Congress intended to adopt a regime of strict liability, imposing liability upon operators (albeit with lesser penalties) for their non-negligent and "warrantable" acts of non-compliance. That the Mine Act imposes strict liability does not mean, however, that Congress did not also impose vicarious liability (the question we do decide today). And only by reading the Act to create vicarious liability can we give effect to every word of the statute. For, by excluding rank and file miners from the definition of an "operator," and by increasing the penalties where an "operator" is at fault, the Mine Act clearly contemplates that a violation may be found where the wrongful act is performed by someone other than the operator. To hold otherwise would be to ignore Congress's use of the statutorily defined term "operator" in the two sections of the Act set out above.

In short, there can be no doubt that, when viewed as a whole, the Mine Act provides for a scheme of vicarious liability. Having found the statute to be unambiguous on its face, we pause only to notice Western's arguments based upon the legislative history of the Act.

### 3. *The Legislative History of the Mine Act*

The parties expend a great deal of energy delving into the legislative history of the Mine Act and its predecessor, the Coal Act, but only one point is necessary to dispose of the issue. Western does not argue that the legislative history forecloses a vicarious liability standard, but merely contends that it "does not provide clear and convincing support for the proposition ... that the [Mine] Act requires strict [by which Western means vicarious] liability." Even assuming that Western's assessment

of the legislative history is correct, however, the statutory language itself establishes the relevant standard. Ambiguous legislative history does not becloud a clear statutory command.

### III. CONCLUSION

In short, the statute is clear: the Mine Act embodies a scheme of vicarious liability. Western advances no argument sufficiently distinct from its primary argument canvassed above to warrant separate treatment. Because the Commission's interpretation of the Mine Act is correct, the petition for review is

DENIED.