FREEMAN UNITED COAL MINING COMPANY, Petitioner,

v.

FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION and Secretary of Labor, Respondents.

Nos. 96–1185, 96–1186.

United States Court of Appeals, District of Columbia Circuit.

Argued January 31, 1997.

Decided March 11, 1997.

Richard R. Elledge, Chicago, IL, argued the cause, and filed the briefs, for petitioner Freeman United Coal Mining Company.

Timothy M. Biddle, argued the cause, for petitioners Neal Merrifield and James Yancik, with whom Thomas C. Means, Washingotn, DC, was on the briefs.

Robin A. Rosenbluth, Attorney, U.S. Department of Labor, argued the cause, for respondents, with whom J. Davitt McAteer, Acting Solicitor of Labor, and W. Christian Schumann, Counsel, were on the brief. Norman M. Gleichman, Washington, DC, Federal Mine Safety and Health Review Commission, entered an appearance.

Peter Buscemi and Robert A. Dufek, Washington, DC, were on the brief, for amicus curiae Bituminous Coal Operator's Association, Inc.

Before: EDWARDS, Chief Judge, WALD and SENTELLE, Circuit Judges.

Opinion for the Court filed by Chief Judge EDWARDS.

Opinion dissenting in part filed by Circuit Judge WALD.

HARRY T. EDWARDS, Chief Judge:

This case arose when four employees were injured following the collapse of a section of cement walkway in a coal preparation plant owned by petitioner Freeman United Coal Mining Company ("Freeman"). The collapse resulted from severe corrosion of the steel beams supporting the walkway. An Administrative Law Judge ("ALJ") found that Freeman and two of its supervisors—petitioners James Yancik and Neal Merrifield—were liable for civil penalties based on their violation of 30 C.F.R. § 77.200 (1996), which requires that "[a]ll mine structures, enclosures, or other facilities (including custom coal preparation) ... be maintained in good repair to prevent accidents and injuries to employees."

Under section 110(a) of the Mine Act, 30 U.S.C. § 820(a) (1994), the operator of a coal mine faces strict liability for any violation of a mandatory safety standard. Freeman argues that 30 C.F.R. § 77.200 is unconstitutionally vague, but we find this claim meritless. Although the cited regulation is admittedly general, it is clear enough to provide notice of the conduct that it requires or prohibits. Moreover, in this case, it is plain from the record that Freeman had notice of a corrosion problem in its plant and the safety hazard it posed. As a result, Freeman cannot claim that it was unaware of its responsibility to maintain the structural integrity of its plant against corrosion.

Under section 110(c) of the Mine Act, 30 U.S.C. § 820(c) (1994), individual corporate agents are personally liable for a safety violation if they *"knowingly* authorized, ordered, or carried out [the] violation." *Id.*

(emphasis added). The Federal Mine Safety and Health Review Commission ("FMSHRC" or "Commission") has defined "knowledge" under section 110(c) to include both actual knowledge and having "reason to know" of a violative condition. The FMSHRC has also held that liability under section 110(c) requires "aggravated conduct" rather than "ordinary negligence." We find this interpretation of the statute to be reasonable and permissible. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). In the instant case, however, the ALJ did not find that Yancik and Merrifield "knowingly" violated § 77.200; rather, the ALJ focused on a nebulous concept of "high negligence." On the record at hand, we can discern no reasonable basis for a finding that Yancik or Merrifield "knowingly authorized" the safety violation, or that they engaged in "aggravated conduct." Therefore, we conclude that the ALJ's finding of "high negligence"—whatever it means—cannot support a finding of liability under section 110(c). Accordingly, we grant Yancik and Merrifield's petitions for review and reverse the findings of individual liability by FMSHRC.

## I. BACKGROUND

Freeman operates the Orient Mine No. 6 near Waltonville, Illinois. The original coal preparation plant at the mine, where the collapse at issue in this case occurred, was built in 1968. In 1984, a new coal preparation plant was constructed at the mine immediately adjacent to the old plant. The old plant was left standing and continued to be used for certain operations in conjunction with the new facilities. *See* Joint Appendix ("J.A.") 58–59.

Because of the nature of the plant's operations, the steel columns and beams framing the old plant had been, and continued to be, subject to pervasive corrosion. *See* J.A. 59. Following the collapse of a conveyor belt in 1987, Freeman began a rehabilitation program for the old plant. As part of this program, Freeman hired the engineering firm of Roberts & Schaefer to assess the structural integrity of the facility. On No-

vember 30, 1989, Roberts & Schaefer issued its report. Although Roberts & Schaefer found that, in the majority of cases, enough metal remained in the steel members to support reduced loads in the old plant, *see* Government Exhibit 3 at 2, *reprinted in* Exhibits, Volume I, the report cautioned that "[a]mong the items that need immediate attention are beams and columns where holes exist or can be punched out with a hammer," *id.* at 3. The report also made clear that its findings were "based only upon a visual inspection," and it warned that the "[e]xtent of deterioration and actual safety of [the] structure cannot be determined without extensive measuring, testing, and calculation." *Id.* at 5. The report identified a number of specific areas that needed repair, but did not mention the walkway area at issue in this case.

Freeman undertook the repairs suggested by the Roberts & Schaefer report and had substantially completed work on the specific items mentioned in the report by mid-1990. *See* Hearing Transcript ("Tr.") at 482–83, *reprinted in* Exhibits, Volume II. In addition, Freeman established an ongoing program of inspection and rehabilitation at the old plant. Inspections were carried out by Yancik, Freeman's Manager of Quality Control and Preparation Plant Maintenance, who reported on his findings to the Vice President of Operations and others. From October 1991 on, the Vice President of Operations was Merrifield. Yancik claims that he was in the old plant almost every week and conducted formal inspections on a quarterly basis. *See* Tr. at 387, 415. Reports of his inspections, introduced into evidence, were dated October 1987; March, May, and December 1988; March 1989; January, October, and December 1990; February, August, and December 1991; March and June 1992; and March 1993. *See* Respondents' Exhibit 2, *reprinted in* Exhibits Volume I. Yancik's inspections consisted of a visual survey of the structure of the plant and testing with a hammer any steel beams that appeared to be corroded. *See* Tr. at 415.

Yancik is a mining engineer, but not a structural engineer. *See* Tr. at 383. As a result, the final determinations regarding repairs were made by the engineering depart-

ment at Freeman. *See* Tr. at 408. The engineering department also reported to the Vice President for Operations—Merrifield—who was responsible for prioritizing repairs, approving budgets and implementing the rehabilitation program for the old plant. *See* Tr. at 439, 497. There was no evidence that Merrifield ever delayed repairs recommended by the engineering department or that he ever denied the department any requested resources to maintain the plant. In fact, the record showed that, between 1989 and 1993, Freeman spent substantial sums of money to maintain the old plant. *See* Respondents' Exhibit 13, *reprinted in* Exhibits, Volume I.

On June 8, 1993, a section of concrete walkway in the old plant collapsed, seriously injuring four Freeman employees who were thrown onto the floor seventeen feet below. An investigation by the Mine Safety & Health Administration ("MSHA") concluded that the collapse was caused by the advanced deterioration of a beam supporting the walkway. *See* Government Exhibits 13, 14, *reprinted in* Exhibits, Volume I. It is undisputed that that particular beam had never been identified as needing repair by either Roberts & Schaefer or Yancik, nor had it been identified as a hazard during eleven MSHA inspections, nine state safety inspections, and six union inspections conducted in the year prior to the collapse. *See* Tr. at 207, 434, 513–15, 537, 552–53, 600–01.

Freeman was cited for violation of 30 C.F.R. § 77.200 which provides that "[a]ll mine structures, enclosures, or other facilities (including custom coal preparation) shall be maintained in good repair to prevent accidents and injuries to employees." After a hearing, the ALJ upheld the citation and imposed civil penalties of $10,000 against Freeman, $5,000 against Merrifield, and $4,000 against Yancik. Petitioners were denied review by the FMSHRC and, therefore, the ALJ's decision became final on May 8, 1996.

## II. DISCUSSION

### A. *Freeman*

█ The parties agree that section 110(a) of the Mine Act imposes strict liability on

coal mine operators for any violation of a mandatory safety standard. *See Western Fuels–Utah, Inc. v. FMSHRC,* 870 F.2d 711, 716 (D.C.Cir.1989); *Asarco, Inc.–Northwestern Mining Dept. v. FMSHRC,* 868 F.2d 1195, 1197 (10th Cir.1989). Freeman argues, however, that the safety standard it allegedly violated, 30 C.F.R. § 77.200, contravenes the due process clause because it is unconstitutionally vague.

■ In order to satisfy constitutional due process requirements, regulations must be sufficiently specific to give regulated parties adequate notice of the conduct they require or prohibit. *See Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972); *General Elec. Co. v. EPA,* 53 F.3d 1324, 1328–29 (D.C.Cir. 1995); *Gates & Fox Co., Inc. v. OSHRC,* 790 F.2d 154, 156 (D.C.Cir.1986). The courts have recognized, however, that "specific regulations cannot begin to cover all of the infinite variety of ... conditions which employees must face," and that "[b]y requiring regulations to be too specific [courts] would be opening up large loopholes allowing conduct which should be regulated to escape regulation." *Ray Evers Welding Co. v. OSHRC,* 625 F.2d 726, 730 (6th Cir.1980); *accord Grayned,* 408 U.S. at 110, 92 S.Ct. at 2300 (indicating that regulations need not achieve "mathematical certainty" or "meticulous specificity," and may instead embody "flexibility and reasonable breadth" (internal quotations omitted)). Accordingly, regulations will be found to satisfy due process so long as they are sufficiently specific that a reasonably prudent person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, would have fair warning of what the regulations require. *See Utah Power & Light Co. v. Secretary of Labor,* 951 F.2d 292, 295 n. 11 (10th Cir.1991); *Vanco Constr., Inc. v. Donovan,* 723 F.2d 410, 412–13 (5th Cir.1984); *Ray Evers Welding,* 625 F.2d at 732.

The regulation at issue in this case provides, in its entirety:

> All mine structures, enclosures, or other facilities (including custom coal preparation) shall be maintained in good repair to prevent accidents and injuries to employees.

30 C.F.R. § 77.200. We find that the regulation was sufficiently specific to provide notice to petitioners of the conduct that it required or prohibited. As the ALJ found, the plain meaning of the standard's requirement that structures be "maintained" to prevent accidents and injuries is that structures like the old preparation plant be " '[kept] in a state of repair or efficiency[,] ... [kept] in good order [,] ... or preserv[ed]' " so that they do not deteriorate to a condition that is hazardous. J.A. 67 (citing Webster's Third New International Dictionary, Unabridged 1362 (1971); A Dictionary of Mining, Mineral, and Related Terms 675 (1968); and Black's Law Dictionary 859 (5th ed.1979)).

Any reasonably prudent person would recognize that allowing steel beams supporting a walkway to corrode and deteriorate to the point of collapse constitutes a failure to maintain a facility in good repair. Indeed, the record makes clear that Freeman recognized its obligation to ensure that the old preparation plant was structurally sound despite the ongoing corrosion. Because the plain language of § 77.200 gives fair notice of what it requires, the regulation is not unconstitutionally vague.

### B. *Yancik and Merrifield*

■ Section 110(c) of the Mine Act provides that, whenever a corporate operator violates the Act or its standards, "any director, officer, or agent ... who knowingly authorized, ordered, or carried out such violation" may be held liable. 30 U.S.C. § 820(c). Yancik and Merrifield challenge the ALJ's finding that they "knowingly" caused or permitted a safety violation in this case, arguing that the ALJ found merely negligence or "high negligence," and that the record evidence cannot support a finding of knowing violation. At the heart of this claim is a dispute over the Commission's interpretation of the term "knowingly" in section 110(c).

The Commission has defined the term "knowingly" as follows:

"Knowingly," as used in the Act, does not have any meaning of bad faith or evil purpose or criminal intent. Its meaning is rather that used in contract law, where it means *knowing or having reason to know.* A person has reason to know when he has such information as would lead a person exercising reasonable care to acquire knowledge of the fact in question or to infer its existence.

*Secretary of Labor v. Richardson,* 3 F.M.S.H.R.C. 8, 16 (1981) (emphasis added, internal quotations omitted), *aff'd,* 689 F.2d 632 (6th Cir.1982). *Accord Secretary of Labor v. BethEnergy Mines,* 14 F.M.S.H.R.C. 1232, 1245 (1992); *Secretary of Labor v. Warren Steen Constr.,* 14 F.M.S.H.R.C. 1125, 1131 (1992); *Secretary of Labor v. Glenn,* 6 F.M.S.H.R.C. 1583, 1585 (1984). In *Richardson,* the Commission specifically held that a finding of a "knowing" violation does not require a showing that the person in question "willfully" violated the Mine Act or Mine Act standards. *See Richardson,* 3 F.M.S.H.R.C. at 15. Rather, the Commission held that it need only be shown that "a person in a position to protect employee safety and health fail[ed] to act on the basis of information that [gave] him knowledge or reason to know of the existence of a violative condition." *Id.* at 16. However, negligence is not enough to establish liability. The Commission has held that section 110(c) liability requires a showing that the person in question demonstrated "aggravated conduct," as distinguished from "ordinary negligence." *BethEnergy,* 14 F.M.S.H.R.C. at 1245.

Petitioners challenge this interpretation of section 110(c), arguing that the term "knowingly" requires a showing of "actual knowledge and specific intent to violate the act." We reject this contention, first, because the plain terms of the statute do not compel the construction advanced by petitioners, and second, because the Commission's interpretation is reasonable and permissible and thus entitled to deference. *See Chevron,* 467 U.S. at 842–45, 104 S.Ct. at 2781–83.

In reaching this conclusion, we turn first to the statutory language itself. "Knowingly" may convey any of a number of meanings. This court has found the term "knowingly" to include "actual knowledge," "deliberate ignorance," and "reckless disregard." *See United States v. TDC Management Corp. Inc.,* 24 F.3d 292, 297–98 (D.C.Cir.1994) (interpreting "knowingly" within the meaning of the False Claims Act). Other courts have also found that "knowingly" encompasses more than actual knowledge. *See, e.g., United States v. DiSanto,* 86 F.3d 1238, 1257 (1st Cir.1996) (noting that the meaning of "knowledge" depends upon context and that a continuum of meaning stretches from "constructive knowledge" to "actual knowledge" with various gradations between), *petition for cert. filed,* 65 U.S.L.W. 3531 (U.S. Nov. 12, 1996) (No. 96–1176); *Suzuki of Orange Park, Inc. v. Shubert,* 86 F.3d 1060, 1064 (11th Cir.1996) ("knowledge" under Limitation of Vessel Owner's Liability Act includes actual and constructive knowledge); *JCC, Inc. v. CFTC,* 63 F.3d 1557, 1567–68 (11th Cir.1995) (under the Commodity Exchange Act, individual "knowingly" induced violation if he had "actual or constructive knowledge of the core activities that constitute the violation at issue and allowed them to continue" (internal quotations omitted)); *United States v. Hester,* 880 F.2d 799, 802 (4th Cir.1989) (defendant "knowingly" makes false statement in connection with the acquisition of a firearm in violation of 18 U.S.C. § 922(a)(6) if he acts with actual knowledge or "deliberate disregard" for the truth or falsity of his statements).

Given the range of meanings ascribed to the statutory term "knowingly" in these varied contexts, we cannot conclude, as petitioners contend, that the language of section 110(c) unambiguously requires a showing of actual knowledge and specific intent to violate the Act.[1] Nor can we conclude that Congress has definitively resolved the issue of what *mens rea* is required to support a finding of individual liability. As a result, the Commission's interpretation of section 110(c) is entitled to deference so long as it is reasonable.

---

1. Indeed, at oral argument, petitioners' counsel conceded that section 110(c) may permissibly be interpreted to impose liability based on at least some form of constructive knowledge.

The Commission's interpretation of section 110(c), as we understand it, is a fair interpretation of the statutory language. In essence, the Commission has defined "knowledge" for purposes of section 110(c) to include both actual and constructive knowledge of a violative condition. That definition falls well within the range of interpretations given to the term "knowingly" in other contexts. Significantly, we do not understand the Commission to allow individual liability on the basis of any form of negligence. *See BethEnergy*, 14 F.M.S.H.R.C. at 1245 (Section 110(c) liability requires a showing that the person in question demonstrated "aggravated conduct" rather than "ordinary negligence.").

■ In this case, however, the ALJ did not find that Yancik or Merrifield "knowingly" violated 30 C.F.R. § 77.200. Rather, the ALJ found "high negligence." *See* J.A. 76 ("I find that the violations of § 77.200 by the individual Respondents were due to high negligence....."). So far as we can tell, "high negligence" is a concept that has relevance only to the determination of the amount of a civil penalty to be imposed once liability has been determined. *See* 30 C.F.R. 100.3(d) (1996) (degree of negligence—"no negligence," "low negligence," "moderate negligence," "high negligence," or "reckless disregard"—is one factor in penalty formula); 30 C.F.R. § 100.5(h) (1996) (special assessment of penalty may be warranted if violation involved "extraordinarily high degree of negligence"). "High negligence," which is apparently negligence without mitigating circumstances, *see* 30 C.F.R. § 100.3, tbl. VIII, is not a permissible basis upon which an individual agent may be found liable for "knowingly" violating a safety standard under section 110(c) of the Mine Act.

■ The proper inquiry is whether Yancik or Merrifield knew or had "reason to know" of the hazardous level of deterioration of the walkway beam that collapsed, *i.e.*, whether either had actual or constructive knowledge of the violative condition. The record does not support the conclusion that either did. Certainly both men knew of the risk that corrosion of support beams in the old plant could cause structural instability. But they were addressing that risk responsibly by con-ducting regular inspections and repairs. In addition, there were numerous inspections conducted by the MSHA, state regulators, and the union, and no one ever reported concern regarding the walkway beam at issue or suggested to Freeman that its inspection and rehabilitation program was inadequate. Under these circumstances, it cannot be said that Yancik or Merrifield *knowingly* caused a violation of 30 C.F.R. § 77.200. Accordingly, we grant Yancik's and Merrifield's petitions for review and reverse the Commission's findings of individual liability.

### III. CONCLUSION

For the foregoing reasons, the court denies Freeman's petition for review, grants Yancik's and Merrifield's petitions for review, and reverses the Commission's findings of individual liability.

*So ordered.*

WALD, Circuit Judge, dissenting in part:

The majority upholds the Federal Mine Safety and Health Review Commission's ("the Commission") interpretation of the word "knowingly" as incorporating a "constructive knowledge" or "reason to know" standard, *see* majority opinion at 364, but rejects the Administrative Law Judge's ("ALJ") application of that standard to petitioners James Yancik and Neal Merrifield. Because I find that the record amply demonstrates that the ALJ did not err in finding that these petitioners had reason to know of the dangerous condition of the walkway that collapsed, I dissent from the portion of the majority opinion that vacates the penalties imposed on them under section 110(c) of the Federal Mine Safety and Health Act of 1977.

The collapse which led to the imposition of sanctions against Yancik and Merrifield was not the first to occur in the Orient No. 6 Mine's old preparation plant—six years earlier a conveyor belt had collapsed, just sixty feet from the beam that caused the tragic accident in 1993. Joint Appendix ("J.A.") at 59. At that time, James Yancik was the plant's Manager of Quality Control and Preparation Plant Maintenance, reporting to Neal Merrifield, the Mine Superintendent. This earlier collapse starkly demonstrated the er-

oding effect that the corrosive atmosphere inside the plant had on exposed metal structures, and led the Freeman United Coal Mining Company ("the Company") to undertake a long-term rehabilitation program.

In 1989, two years after that first collapse, the Mine Safety and Health Administration ("MSHA") advised the Company to hire a consultant to evaluate the plant's structural condition. The Company hired the Roberts and Schaefer Company ("R&S"), the firm that designed the plant, to conduct the evaluation. An R&S engineer, accompanied by Yancik, toured the plant, and on November 30, 1989, R&S issued its Report to Determine Structural Integrity of Existing Coal Preparation Plant for Freeman United Coal Company Orient No. 6 Mine ("R&S Report"), which both Yancik and Merrifield received and read. The second text page of this report included the following warning: *"Among the items that need immediate attention are beams and columns where holes exist or can be punched out with a hammer."* Exhibits Volume One, Tab 3, at 3 (emphasis added). The fourth and final text page reiterated the point that visual inspections alone could not adequately establish the safety of metal beams:

> Although structure appears to be sound in general these findings are based only upon a visual inspection. No load tests or calculations were performed to determine actual stresses. Extent of deterioration and *actual safety of structure cannot be determined without extensive measuring, testing, and calculation.*

*Id.* at 5 (emphasis added). There followed a list of recommendations, of which the first was "[p]ower tool cleaning, priming, and painting of all steel, to prevent further deterioration." *Id.*

For six years after the 1987 conveyor belt collapse, and for three and a half years after Yancik and Merrifield had read the explicit warnings in the R&S Report, both of them permitted miners to use walkways daily that were supported by exposed metal beams *that had never been tested to establish their safety.* Given that history, I cannot fathom how the majority reaches the conclusion—in the face of the earlier collapse, the warnings in

the R&S Report, and the ongoing process of corrosion obviously taking place between the first and second collapses—that the plant's Manager of Quality Control and Mine Supervisor had no "reason to know" that a beam sixty feet away from the one that failed in 1987 could fail in 1993, if it were not replaced or reinforced, or even tested, in the interim. *See* majority opinion at 364. Knowing that a nearby beam had collapsed and that its failure had been caused by a corrosive atmosphere which affected all of the plant's beams, and having been expressly warned against relying on mere visual inspections, Yancik and Merrifield had ample reason to test those beams that supported platforms on which miners were required to walk every day. And the record clearly shows that, had they tested the beam that eventually failed in 1993, they would have discovered that it was unsafe. *See* Transcript at 245. Thus, Yancik and Merrifield had the "reason to know" required for liability under section 110(c).

My colleagues' claim that the record cannot support this conclusion, *see* majority opinion at 364, is incomprehensible to me; but they also appear to assert that even if Yancik and Merrifield *did* have constructive knowledge of a risk, they were "addressing that risk responsibly by conducting regular inspections and repairs." *Id.* On this issue I note, first, that the record incontrovertibly shows that Yancik's and Merrifield's constructive knowledge involved a risk of a far more severe and particularized sort than the majority's vague and amorphous reference to a "risk that corrosion of support beams in the old plant could cause structural instability" suggests. *Id.* Even if they had never read the R&S Report, and even if they could not be charged with the knowledge that six years' worth of corrosion would eat away substantially all of the plant's exposed and unrepaired metal beams, Yancik and Merrifield *still* had to realize the significant risk of a dangerous collapse caused by the failure of a corroded exposed metal beam, based on the fact that just such a collapse had already occurred in 1987. Second, and more importantly, I fail to see how the *visual* inspection of the beam that later failed, combined with the repair and replacement of *other* corroded

beams in the plant, can support any conclusion that it was "responsibl[e]" to let miners walk on a platform which stood seventeen feet above a concrete floor and was supported by *untested, unrepaired* exposed metal beams. *Id.* If my colleagues in the majority were to drive over an old, decaying bridge spanning a mile-deep gorge, I doubt they would take comfort in the knowledge that the bridge authority was repairing all of its old bridges one at a time, and simply hadn't gotten around to fixing this one yet, or even testing it to determine whether it was safe.

Next the majority refers to the fact that "numerous inspections [were] conducted by the MSHA, state regulators, and the union," none of whom identified any immediate risk of another collapse. *Id.* But these inspectors were not privy to the array of information held by Yancik and Merrifield, and lacked the expertise and intimate knowledge of the old preparation plant enjoyed by these veteran mine officials. Furthermore, we would contravene Congress' intent in providing for the punishment of mine employees involved in "knowing" violations of safety requirements were we to permit mine officials to rely on inspections conducted by outside authorities to insulate themselves from liability.

The last basis on which the majority rests its rejection of the ALJ's finding of liability simply ignores what the ALJ said. The majority asserts that "the ALJ did not find that Yancik or Merrifield 'knowingly' violated 30 C.F.R. § 77.200." *Id.* at 364. But he did. *See MSHA v. Freeman United Coal Mining,* 18 F.M.S.H.R.C. 438, 456 (1996) ("I find that Respondents Merrifield and Yancik 'knowingly authorized, ordered, or carried out' a violation of 30 C.F.R. § 77.200."). The majority then contends that the ALJ could properly find Yancik and Merrifield liable under the "reason to know" standard only if he found them guilty of "aggravated conduct." Majority opinion at —— (quoting *MSHA v. BethEnergy Mines,* 14 F.M.S.H.R.C. 1232, 1245 (1992)). He did that, too. *See Freeman United Coal Mining,* 18 F.M.S.H.R.C. at 458 ("The penalties are higher ·than the penalties proposed by

the Secretary because of Respondents' *aggravated conduct* in ignoring the clear steps needed to protect the safety of the miners.") (emphasis added).

In sum, I believe that the record strongly supports the ALJ's clearly articulated finding regarding the liability of petitioners Yancik and Merrifield, and I respectfully dissent from that portion of the majority opinion reversing the Commission's findings of their individual liability.