**Jorge FLOREZ, on Behalf of Raul WALLACE, SS# 131–66–2488, Plaintiff-Appellant,**

v.

**John J. CALLAHAN, Acting Commissioner of Social Security, Defendant-Appellee.**

**Docket No. 97–6133.**

United States Court of Appeals, Second Circuit.

Argued Nov. 18, 1997.

Decided Sept. 29, 1998.

Christopher James Bowes, Center for Disability Advocacy Rights (CeDAR), Inc., New York City, for Plaintiff–Appellant.

Lorraine S. Novinski, Assistant United States Attorney, New York City (Mary Jo White, United States Attorney, Gideon A. Schor, Assistant United States Attorney, Southern District of New York, New York City, of counsel), for Defendant–Appellee.

Before: KEARSE, CARDAMONE, Circuit Judges, and LEISURE*, District Judge.

CARDAMONE, Circuit Judge.

This appeal from a judgment entered in the United States District Court for the Southern District of New York (Duffy, J.), which affirmed the rulings of the acting Commissioner of Social Security (Commissioner), raises issues of first impression in this Circuit. We must decide whether Supplemental Security Income (SSI) benefits for a child under age 18, who suffers from psychological disabilities, were calculated correctly under governing statutory and regulatory law.

The plaintiff stepfather took on the care and support of his emotionally disabled stepson after his wife, the child's mother, abandoned her family. When the stepfather applied for SSI disability benefits on behalf of his stepson, the Social Security Administration (the agency) determined the child qualified for help, and calculated benefit payments in two parts: (1) for the period of time that the child lived at home prior to his admission to a psychiatric center; and (2) for the period of time after the child was admitted to the center.

Plaintiff, in assuming the sole responsibility of caring for his wife's child after she left home, shows himself to be a person who plainly believes that in passing through life, any kindness he can show to another must be shown now, and not put off until another day. One would suppose that a social services agency would encourage such a generous attitude. But, the Social Security Administration adopted quite the opposite position and penalized the stepfather by ruling that his income, prior to the child's entering the psychiatric center, was attributable to the child and thereby reduced the amount of monthly SSI benefits. The stepfather appeals this first ruling, and also appeals a second ruling that interpreted the regulations to authorize a reduced flat-rate payment of SSI benefits once his stepson was admitted to the medical care facility.

We agree with the stepfather that with respect to the time when the child lived at home, in counting a portion of the stepfather's income as the child's own (also known as "deeming"), the Social Security Administration failed to give effect to the plain language of its own regulations. With respect to the agency's second ruling, we find no error in either the substance or interpretation of the regulations regarding what SSI payments should be awarded for the time in which the child lived at the psychiatric center. Hence, we reverse in part, and affirm in part.

---

* Hon. Peter K. Leisure, Senior Judge, United States District Court for the Southern District of New York, sitting by designation.

## BACKGROUND

### Family Background

Raul Wallace is now a teenager, born on October 28, 1982 in New York City. His natural father is deceased. On January 13, 1984 his natural mother married plaintiff Jorge Florez. A daughter was born out of that marriage. Raul's mother, who apparently suffers from alcoholism, abandoned her home, husband and children in 1985. Her only contacts with the family since then have consisted of uninvited late night drunken visits to Florez' apartment.

On May 8, 1985 Florez sought and obtained in New York State Family Court a temporary order of protection against Raul's mother and temporary custody of Raul. Later, Family Court awarded Florez full custody and issued a final order of protection against Raul's mother not to interfere with Florez' custody of the children. Even so, another temporary order of protection was issued on April 5, 1994 instructing her to stay away from Florez' residence and his place of business. Florez has unsuccessfully tried to obtain a divorce, but remains legally married to Raul's mother.

Raul lived with his stepfather, who cared for him from 1985 until July 31, 1991, when he began voluntary inpatient psychiatric treatment at the Manhattan Children's Psychiatric Center (MCPC). For the period of time relevant to this appeal, Raul lived at MCPC from Monday afternoons through Friday mornings of each week. He would then be given a pass to spend the weekend at Florez' apartment.

### Prior Proceedings

Florez first applied for SSI benefits on behalf of his stepson on August 4, 1989. An initial review resulted in a denial of benefits. Following the Supreme Court's decision in *Sullivan v. Zebley*, 493 U.S. 521, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990), Florez re-applied for benefits on March 24, 1992, and used the original application date as a protective filing date.

Upon this second review, the Commissioner determined that Raul satisfied the disability requirements retroactive to August 1, 1989. Nevertheless, in calculating benefits owed, the agency determined that Florez' income was too high to award Raul any payments for the 16–month period between August 1989 (the original filing date) and December 1990. But when plaintiff's income dropped for seven months from January 1991 through July 1991, Raul became income-eligible for SSI payments at a rate of $66.98 per month. From August 1991 forward, while Raul was a patient at MCPC, the agency awarded a flat-rate payment of $35 per month.

After receiving notice of the Commissioner's decision, Florez retained MFY Legal Services, Inc. and, on March 17, 1993, submitted a Request for Reconsideration of the benefit amount. That request was denied on two grounds: (1) before Raul received inpatient treatment at MCPC, Florez' income as a stepparent was deemable to Raul; and (2) after Raul received inpatient treatment at MCPC, he was under the jurisdiction of the hospital.

Florez' attorney then asked for a hearing, which was held before an Administrative Law Judge (ALJ) on May 3, 1994. The ALJ issued his decision on June 22, 1994, in which he found the agency had correctly calculated Raul's SSI benefits. This became the final decision of the Commissioner on January 23, 1995, when the Social Security Administration Appeals Council denied Florez' request for review.

Having exhausted administrative remedies, Florez filed this action on his stepson's behalf in the Southern District of New York on March 29, 1995, seeking a reversal of Raul's SSI benefits determination. Both parties moved for judgment on the pleadings. The district court upheld the Commissioner's rulings and calculations in a judgment entered March 26, 1997. In a written endorsement, the court affirmed the agency's application of the regulations providing for the deeming of a stepparent's income and for a reduction in payments when the recipient is a resident of a publicly-funded institution. From this judgment, Florez appeals.

## DISCUSSION

### I Deeming Income from a Stepparent to a Stepchild

#### A. *Standard of Review*

Substantial deference is to be accorded an agency when it interprets its own regulations. Reversal is warranted only when that interpretation is "plainly erroneous," that is, where the plain language of the regulation itself or some other indication of the agency's intent at the time of promulgation compels a different result. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994). Our reading of the regulations at issue on the deeming aspect of the appeal leads us to believe that the Commissioner and the district court failed to account for the language set out in the applicable regulations.

#### B. *Regulations Governing the Deeming of Income*

The SSI program for the aged, blind and disabled is administered under regulations found at 20 C.F.R. Part 416 (1997). Subpart K (§§ 416.1100–416.1182), entitled "Income," explains how income is treated for purposes of SSI eligibility. The rules governing the deeming of income are found at §§ 416.1160–416.1169.

Section 416.1160 sets forth what it means to deem income, and presently reads

(a) *General.* We use the term deeming to identify the process of considering another person's income to be your own.

. . .

(2) *Ineligible parent.* If you are a child to whom deeming rules apply (See § 416.1165 [containing the formulas used to calculate the amount of income deemed from an ineligible parent]), we look at your parent's income (and that of your parent's spouse) to decide whether we must deem some of it to be yours. We do this because we expect your parent to use some of his or her income to take care of your needs.

20 C.F.R. § 416.1160 (1997). An "ineligible parent" for deeming purposes is defined as a "natural or adoptive parent, or the spouse (*as defined in § 416.1101*) of a natural or adoptive parent, who lives with you and is not eligible for SSI benefits." 20 C.F.R. § 416.1160(d) (1997) (emphasis added).

It is in this definition of an "ineligible parent" that the crux of the appeal lies. If Florez qualifies as a "spouse" under § 416.1101, then he is also an "ineligible parent" and the agency acted properly in deeming part of his income to his stepson. In looking to § 416.1101 to find the answer, we learn that this section defines "spouse" as that term is used throughout subpart K, to mean "someone who *lives with another person* as that person's husband or wife. (*See § 416.1806*)." 20 C.F.R. § 416.1101 (1997) (emphasis added). Florez focuses on the phrase "lives with another person" and argues that because he no longer lives with his wife, his income should not be attributable to Raul.

The Commissioner maintains this logic fails to account for the reference to § 416.1806. That section, found in Subpart R entitled "Relationship," states that a person will be considered another person's spouse, and thereby married for SSI purposes, when: (1) the two are legally married pursuant to the law of the state where they permanently reside or where they permanently resided when they lived together; (2) the Commissioner decides that either person is entitled to Social Security benefits because s/he is the spouse of the other; or (3) unrelated persons of the opposite sex live together and hold themselves out as husband and wife. *See* 20 C.F.R. § 416.1806 (1997). The Commissioner contends that because § 416.1101 incorporates the broader definition of "spouse" found in § 416.1806, persons who are married under state law need not be living together for a stepparent's income to be deemed to a child since no such requirement exists in § 416.1806(1) itself.

The Commissioner's argument, however, disregards explicit language found in § 416.1101. Although the definition of "spouse" for deeming purposes plainly mandates that a husband and wife *live together*, the Commissioner gives no adequate explanation of how to reconcile this language with § 416.1806. His ruling with respect to Florez

essentially ignores the "lives with another" language, as though it were not part of the agency's applicable regulations.

### C. *Reconciling the Regulations*

■ We believe the language of these two sections may be reconciled by reading them as separate requirements of a two-part test created by the regulatory scheme. The first part of the test asks: does Florez live with Raul's mother? In this case, the answer is "no" and the inquiry need go no further. But if the answer were "yes," then the second part of the test, to which we would turn, would ask: in what manner do these two people live together? If they live together as "husband and wife," then Florez would be a "spouse" and thereby an "ineligible parent." The reference to § 416.1806 is to make clear that one who qualifies as a "husband" or "wife," and thereby satisfies the second part of the test, need not be limited to a person legally married under state law. Rather, the terms may also encompass those to whom the Commissioner has awarded benefits because he decided one person is the spouse of the other, as well as those men and women who live together holding themselves out as husband and wife.

### 1. *Regulatory and Statutory Construction Supports This Approach*

Our reasons for taking this approach follow. First, if the definition of "spouse" in § 416.1101 did not intend to draw a distinction between husbands and wives who live together and those who do not, then no reason exists for including the phrase "lives with another person." The section would simply read that a spouse is a "person's husband or wife under the rule[ ] of § [ ] 416.1806," which is exactly how "spouse" is defined elsewhere in the SSI regulations. *See* 20 C.F.R. § 416.1801(c) (1997).

Second, the parenthetical reference in § 416.1101 has been revised as recently as 1995, so that any argument that the drafters were unaware of the conflicting phraseology is implausible. *See* Supplemental Security Income for the Aged, Blind, and Disabled—Elimination of Waiting Period for Termination of Couple Status, 60 Fed.Reg. 16,373,

16,373 (1995) (removing the parenthetical reference to § 416.1811 because that section was eliminated). Most significantly, when the agency amended this regulation, it chose to keep the "lives with another person" language.

In contrast, the agency has omitted this language when defining the concept elsewhere in the regulations. *See, e.g.,* 20 C.F.R. § 416.1801(c) (defining "spouse"); 20 C.F.R. § 416.1881(b) (1997) (explaining that a stepparent is "the present husband or wife of your natural or adoptive parent"). Neither of the cited sections refers to a husband and wife living together. The fact that § 416.1101 includes language to that effect, when other regulations within the SSI program do not, leads us to conclude this language should not be ignored. *See generally Silverman v. Eastrich Multiple Investor Fund, L.P.,* 51 F.3d 28, 31 (3d Cir.1995) ("[A] basic tenet of statutory construction, equally applicable to regulatory construction, [is] that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous."). If courts were free to pick and choose what part of a statute or, as here, a regulation to rely on and what part to ignore, then the courts—and not Congress or an executive agency promulgating its own regulations—would, in effect, draft the law as well as construe its meaning.

The Commissioner responds to this approach by asserting that statutory authority does not permit him to incorporate a "living together" requirement into the definition of "spouse" because, except in certain circumstances Congress calls for the application of state law to determine when two individuals are husband and wife for SSI purposes. *See* 42 U.S.C. § 1382c(d) (1994). We are not so easily discouraged. Congress' directive is satisfied by § 416.1806 ("We will consider someone to be your spouse ... for SSI purposes if ... [y]ou are legally married under the laws of the State where your and his or her permanent home is (or was when you lived together) ....."), and our two-part test under § 416.1101 incorporates the provisions of § 416.1806.

Moreover, we observe that nowhere in the statute or in the statute's legislative history does Congress expressly define "spouse" for the deeming of income to a child to mean exactly the same as "husband" and "wife" under state law. Legislative authority for subpart K of 20 C.F.R. Part 416 originates in part from 42 U.S.C. § 1382c(f). That section reads in relevant part

> For purposes of determining eligibility for and the amount of benefits for any individual who is a child under age 18, such individual's income and resources shall be deemed to include any income and resources of a parent of such individual (or the spouse of such a parent) who is living in the same household as such individual, whether or not available to such individual, except to the extent determined by the Commissioner of Social Security to be inequitable under the circumstances.

42 U.S.C. § 1382c(f)(2)(A) (1994). Other than a change in the relevant age from 21 to 18, this language is substantively the same as that included in the original legislation passed in 1972. *See* Social Security Amendments of 1972, Pub.L. No. 92–603, § 1614(f)(2), 86 Stat. 1329, 1473–74 (1973). Our review of the House, Senate, and Conference Committee reports accompanying this bill, as well as the Senate debates printed in the *Congressional Record,* failed to shed any further light on exactly what Congress meant when it included the parenthetical phrase "or the spouse of such a parent." Consequently, the force of the Commissioner's declaration that his authority is limited by this statute is further undermined.

### 2. *Policy Considerations*

Of course the strongest argument against reversing the lower court is grounded in the policy underlying the decision to deem income to a child. As the regulation explains, "we expect your parent to use some of his or her income to take care of your needs." 20 C.F.R. § 416.1160(a)(2). Since Florez cared for Raul as though they were biological father and son, one could argue that the agency is simply acting in accordance with its theory that a parent or the spouse of a parent who lives with a child has a responsibility to contribute toward the care of that child.

The Social Security Administration, however, has already spoken on this issue—albeit indirectly—and decided that living arrangements between a stepparent and stepchild are not in and of themselves sufficient to justify deeming a stepparent's income to a stepchild. In its Programs Operations Manual System (POMS) § SI 01310.145B, the agency states

> Deeming applies from a parent to a child when they live together in the same household. However, if a natural or adoptive parent is *deceased or is divorced* from the stepparent, and the *child is living with the stepparent,* the stepparent is *not considered a parent or spouse of a parent* of the eligible child for deeming purposes.

(emphasis added). The agency apparently regards the relationship between the natural parent and the stepparent to be of greater importance for purposes of deeming income than the living arrangements of the stepparent and the stepchild.

■ In this case we have a stepfather whose marriage to the child's mother ended, for all intents and purposes, in 1985 when she abandoned the family home. Thus, our decision to reverse the agency's construction of its regulation does not violate any underlying policy. The above passage from POMS makes clear that the income of a stepparent who lives with his stepchild will not in all instances be attributed to that child.

We also recognize that to find a stepparent like Florez, who cares for a disabled stepchild long after the natural mother abandoned him, is to find a stepparent casting himself in the role of "good samaritan" since he is under no legal obligation to seek custody or take the child into his own home. While we understand the agency's concern about natural parents accepting financial responsibility for their offspring, we do not think this concern should result in penalizing a stepparent's voluntary acceptance of such heavy responsibility by reducing the stepchild's SSI benefits.

Having therefore concluded that the plain language of the regulations, supported by the

history surrounding their promulgation and the legislative history of the authorizing statutes at issue, compels a different result than that reached by the Commissioner and the district court, we must reverse this portion of the judgment.

## II  Flat-rate SSI Benefits for Residents of Medical Care Facilities

### A.  *Standard of Review*

■ On the flat-rate benefits aspect of his appeal, Florez challenges the validity of both the substance of the relevant regulations and the manner in which they were applied. With regard to substance, courts must ask two questions with respect to an administrative agency's construction of an authorizing statute. First, it must be determined "whether Congress has directly spoken to the precise question at issue." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). If Congress has so spoken, then the inquiry ends and the agency is held responsible for implementing the legislative mandate. But if Congress has not spoken, then courts must resolve "whether the agency's [regulation] is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778. A regulation will be upheld unless it is "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844, 104 S.Ct. 2778. So long as the agency's interpretation is reasonable, the Supreme Court has warned against a court substituting its own construction of the statute. *See id.*

■ Once the substance of a regulation is considered reasonable, the administrative agency is afforded even greater deference in applying the regulation. As noted previously, an agency's interpretation of its own rules is overturned only when the plain language of the regulation or an indication of agency intent compels a different result. *See Thomas Jefferson Univ.*, 512 U.S. at 512, 114 S.Ct. 2381.

### B.  *Expression of Congress' Purpose*

When Congress passed the Social Security Amendments of 1972 it decided to limit the SSI benefit amount for residents of medical care facilities. At the time the notice of appeal in this case was filed on May 27, 1997, the statute permitted a disabled child—who "throughout any month" is "in a hospital, extended care facility, nursing home, or intermediate care facility" that receives government subsidies with respect to the child— to receive no more than $360 per year in SSI benefits. 42 U.S.C. § 1382(e)(1)(B) (1994) (amended Aug. 5, 1997)[1]. A House Ways and Means Committee report reveals the legislators' purpose in limiting benefits under these particular circumstances: "For these people [who reside in a medical care facility] most subsistence needs are met by the institution and full benefits are not needed. Some payment to these people, though, would be needed to enable them to purchase small comfort items not supplied by the institution." H.R.Rep. No. 92–231, pt. III.D.3 (1971), *reprinted in* 1972 U.S.C.C.A.N. 4989, 5136.

Congress nowhere further elaborates as to which persons "in" a medical care facility qualify for reduced benefits or what was meant by the phrase "throughout any month." It instead simply set forth a general policy for the agency to follow. As a consequence, absent any clear directive from Congress, our task is to determine whether the regulations promulgated pursuant to this authority reflect a permissible reading of the statute.

### C.  *The Commissioner's Interpretation of the Statute*

#### 1.  *Defining Who is "In" a Government– Subsidized Medical Care Facility*

■ The agency defines a "resident of a public institution" for purposes of SSI eligibility as "a person who can receive substantially all of his or her food and shelter while living in a public institution." 20 C.F.R.

---

1. While the statute formerly listed each type of care facility, each is now characterized simply as "a medical treatment facility." Balanced Budget Act of 1997, Pub.L. No. 105–33, § 5522(c)(1)(A),

111 Stat. 251, 623 (1997). This technical amendment has no bearing on our analysis of the issues on this part of the appeal.

§ 416.201 (1997). Applying this definition, the district court found that Raul was a resident of MCPC.

Florez does not argue that the regulation is unreasonable, but instead asserts it does not apply to Raul. He maintains that because he provides Raul's food and shelter on the weekends, Raul does not receive "substantially all" of his subsistence needs from MCPC and thus fails to meet the definition provided in the regulation.

The Commissioner points out that the key words in the definition of "resident" are "can receive." The use of the phrase "can receive" connotes ability or the potential to receive one's food and shelter from the institution where one stays. No one disputes that if Raul were to stay at MCPC on the weekends, the hospital would allow him to remain in his room and receive prepared meals. From this perspective, Raul *can* have substantially all of his needs met through the hospital. His leaving on the weekends does not change this fact. Florez' argument would have merit only if the regulation read "does receive" or "actually receives."

### 2. *"Throughout Any Month"*

■ A person is in a facility "throughout any month" when

[he is] in the medical care facility as of the beginning of the month and stay[s] the entire month. If [the individual is] in a medical care facility [he] will be considered to have continuously been staying there ... if [he is] temporarily absent for a period of not more than 14 consecutive days.

20 C.F.R. § 416.414(a)(1) (1997). Florez characterizes this definition as "arbitrary and capricious" since the agency gives no reason why 14 days was chosen as the cut-off period for an individual's absence.

Although an explanation might have been helpful and even appropriate, we nonetheless think the regulation is a reasonable interpretation of the statutory phrase "throughout any month." Considering that most months consist of 30 or 31 days, having fewer than 14 consecutive days of absence increases the likelihood that a person spent more time at the institution during the course of a month than he spent away. Of course, any number less than 14 would ensure the same result, but Florez suggests no other number as more appropriate.

Absent direction from Congress, the agency is free to choose the standard it considers best. The number chosen certainly is not unreasonable. The requirement that the absences be consecutive guards against awarding higher benefits to individuals like Raul, who actually spend a substantial amount of time each week at the facility, but are "away" from the facility for brief periods that do not disrupt their stay there throughout any month.

Limiting SSI benefits obviously avoids a double payment of government funds, that is, the government does not pay for an inpatient's care at a medical facility while also paying for practically identical subsistence needs via SSI. Launching another attack on the 14–day rule, Florez insists that the regulation fails to consider individuals like Raul, who do not receive a "double benefit" when they live outside the medical care facility for several days at a time. This argument however, fails to account for the scenario where an individual leaves the facility for a few days at a time, but the agency continues to pay subsidies on his behalf to keep a place available when he returns. Although the individual is not receiving actual food or shelter during his absence, he receives a benefit from the public monies spent on his behalf. Neither party pointed to evidence regarding whether MCPC continues to receive public subsidies while Raul is away on the weekends, and we could find no answer in the record. Yet, regardless of the precise details pertaining to Raul's particular situation, we are convinced that this consideration illustrates that the agency's interpretation of the phrase "throughout any month" is permissible in light of the language and purpose of the statute.

Moreover, to implement a pro rata system as Florez suggests—whereby SSI recipients would be paid a flat rate for each day they are in a medical facility and a formula rate for each day they are absent from that facili-

ty—would create a bookkeeping nightmare. To ask the agency to keep track of how many days an SSI recipient stays in a medical institution on a month-to-month basis and pay benefits accordingly would be asking the agency to shoulder an enormous accounting burden. This proposed alternative further persuades us of the reasonableness of the regulation as it now reads.

The agency's application of the regulations just discussed to Raul Wallace was also a permissible one. As noted, Raul is a resident of MCPC since he can receive substantially all of his food and shelter at the institution. He also is a resident who has stayed at MCPC throughout each month. His absences only on the weekends were necessarily less than 14 consecutive days. As such, the agency correctly calculated Raul's SSI benefits from the date of his admission to MCPC, awarding him the capped statutory amount.

## CONCLUSION

For the foregoing reasons, we reverse in part the judgment appealed from and remand the case to the district court with instructions that it direct the Commissioner of Social Security to recalculate Raul Wallace's SSI benefits for the 24 months from August 1989 to July 1991, exclusive of the income earned by his stepfather, Jorge Florez. The judgment is otherwise affirmed.