14-4071-cv
*Friends of Animals v. Clay et al.*

# In the
# United States Court of Appeals
## For the Second Circuit

————

AUGUST TERM 2015
No. 14-4071-cv

FRIENDS OF ANIMALS,
*Plaintiff-Appellant,*

*v.*

WILLIAM CLAY, IN HIS OFFICIAL CAPACITY AS A DEPUTY
ADMINISTRATOR IN THE DEPARTMENT OF AGRICULTURE, ANIMAL AND
PLANT HEALTH INSPECTION SERVICES, AN AGENCY OF THE UNITED
STATES, AND UNITED STATES FISH AND WILDLIFE SERVICE, AN AGENCY
OF THE UNITED STATES,
*Defendants-Appellees.*

————

Appeal from the United States District Court
for the Eastern District of New York

————

ARGUED: DECEMBER 10, 2015
DECIDED: JANUARY 26, 2016

————

Before: CABRANES, POOLER, and LYNCH, *Circuit Judges*.

_____

Plaintiff-appellant Friends of Animals appeals an October 3, 2014 order of the United States District Court for the Eastern District of New York (John Gleeson, *Judge*) granting summary judgment in favor of defendants-appellees William Clay, in his official capacity as a Deputy Administrator in the Department of Agriculture, the United States Animal and Plant Health Inspection Service, and the United States Fish and Wildlife Service.  Friends of Animals brought this action challenging the Fish and Wildlife Service's issuance of a "depredation permit" to the Port Authority of New York and New Jersey, which authorizes the emergency "take" of migratory birds that threaten to interfere with aircraft at John F. Kennedy International Airport.  Friends of Animals argues that federal regulations prohibit the Fish and Wildlife Service from issuing such a permit.  We disagree, and accordingly **AFFIRM**.

_____

MICHAEL RAY HARRIS, Friends of Animals, Centennial, CO, *for Plaintiff-Appellant*.

MARGARET M. KOLBE (Varuni Nelson and Sandra L. Levy, *on the brief*), Assistant United States Attorneys, *for* Robert L. Capers, United States Attorney, Eastern District of New York, Brooklyn, NY, *for Defendants-Appellees*.

_____

JOSÉ A. CABRANES, *Circuit Judge*:

Plaintiff-appellant Friends of Animals ("FOA") appeals an October 3, 2014 order of the United States District Court for the Eastern District of New York (John Gleeson, *Judge*) granting summary judgment in favor of defendants-appellees William Clay ("Clay"), in his official capacity as a Deputy Administrator in the Department of Agriculture, the United States Animal and Plant Health Inspection Service ("APHIS"), and the United States Fish and Wildlife Service ("FWS"). FOA brought this action challenging FWS's issuance of a "depredation permit" to the Port Authority of New York and New Jersey (the "Port Authority"). The permit authorizes the emergency "take" of migratory birds that threaten to interfere with aircraft at John F. Kennedy International Airport ("JFK"). FOA argues that FWS's own regulations unambiguously prohibit it from issuing such a permit and that the permit should therefore be set aside as the product of agency action that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). FWS argues that its regulations unambiguously authorize the issuance of such a permit. On our *de novo* review of the District Court's grant of summary judgment, *see Karpova v. Snow*, 497 F.3d 262, 267 (2d Cir. 2007), we agree with FWS, and accordingly **AFFIRM**.

## BACKGROUND

The taking[1] of migratory birds is governed by the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. § 703 *et seq.*, and regulations promulgated thereunder. The MBTA, which implements a series of treaties as federal law, *see Fund for Animals v. Kempthorne*, 538 F.3d 124, 126-28 (2d Cir. 2008), prohibits the taking of any bird protected by those treaties "[u]nless and except as permitted by regulations" promulgated under the statute, 16 U.S.C. § 703(a). The Secretary of the Interior is charged with "determin[ing] when . . . it is compatible with the terms of the conventions to allow" the taking of migratory birds and with "adopt[ing] suitable regulations" in accordance with those determinations. *Id.* § 704(a). One such regulation is 50 C.F.R. § 21.41. Under § 21.41, FWS may issue "depredation permits" that authorize the taking (or possession or transport) of migratory birds that are causing injury to certain human interests. 50 C.F.R. § 21.41.[2]

---

[1] To "take" a bird is "to pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to pursue, hunt, shoot, wound, kill, trap, capture, or collect" it. 50 C.F.R. § 10.12 (2014).

[2] Title 50 of the Code of Federal Regulations, Section 21.41 ("Depredation permits"), provides:

> (a) *Permit requirement.* Except as provided in §§ 21.42 through 21.46, a depredation permit is required before any person may take, possess, or transport migratory birds for depredation control purposes. No permit is required merely to scare or herd depredating migratory birds other than endangered or threatened species or bald or golden eagles.

> (b) *Application procedures.* Submit application for depredation permits to the appropriate Regional Director (Attention:

Migratory bird permit office).  You can find addresses for the Regional Directors in 50 C.F.R. 2.2.  Each application must contain the general information and certification required in § 13.12(a) of this subchapter, and the following additional information:

(1) A description of the area where depredations are occurring;

(2) The nature of the crops or other interests being injured;

(3) The extent of such injury; and

(4) The particular species of migratory birds committing the injury.

(c) *Additional permit conditions.*  In[ ]addition to the general conditions set forth in part 13 of this subchapter B, depredation permits shall be subject to requires [sic], in this section:

(1) Permittees may not kill migratory birds unless specifically authorized on the permit.

(2) Unless otherwise specifically authorized, when permittees are authorized to kill migratory birds they may do so only with a shotgun not larger than No. 10 gauge fired from the shoulder, and only on or over the threatened area or area described on the permit.

(3) Permittees may not use blinds, pits, or other means of concealment, decoys, duck calls, or other devices to lure or entice birds within gun range.

(4) All migratory birds killed shall be retrieved by the permittee and turned over to a Bureau representative or his designee for disposition to charitable or other worthy institutions for use as food, or otherwise disposed of as provided by law.

(5) Only persons named on the permit are authorized to act as agents of the permittee under authority of the permit.

Migratory birds that congregate near airports pose a well-known threat to human safety. Indeed, "bird strikes" have resulted in several near-catastrophes at JFK and nearby LaGuardia Airport ("LaGuardia"). *See* J.A. 396 (describing a 1975 collision between herring gulls and a DC-10, which caused the aircraft's engine to explode and the aircraft itself to catch fire); *id.* (describing a 1995 collision between two Canada geese and a Concorde jet, which caused "major damage" to the aircraft); J.A. 405 (describing a 2009 incident in which a pilot was compelled to land a jetliner on the Hudson River after it collided with a flock of geese).[3] In order to reduce the risks associated with such bird strikes, the Port Authority—which operates JFK, as well as LaGuardia—has maintained a depredation permit since 1994, renewing it each year.

The permit of which FOA complains was issued by FWS on June 11, 2014.[4] It identifies eighteen species of migratory birds that

---

(d) *Tenure of permits.* The tenure of depredation permits shall be limited to the dates which appear on its [sic] face, but in no case shall be longer than one year.

[3] References to "J.A." are to the joint appendix.

[4] FOA initially directed its challenge at a depredation permit issued in 2013, under the authority of which three snowy owls were killed in December of that year. The 2013 permit was renewed in June 2014 and its terms lightly altered. *See Friends of Animals v. Clay*, No. 13 Civ. 7293 (JG), 2014 WL 4966122, at *6 n.5 (E.D.N.Y. Oct. 3, 2014); J.A. 1590. Observing that the 2014 permit, though not identical to the 2013 permit, "authorizes the essential activities challenged in the original Complaint," the District Court concluded that "the case [was] not moot." *Friends of Animals*, 2014 WL 4966122, at *6 n.5. The parties have not discussed whether the mootness doctrine precludes our adjudicating the legality of the

6

have, in the past, compromised public safety at JFK, and authorizes the Port Authority to take a quota of birds of each species. *See* J.A. 1590.

In addition to setting out these species-specific quotas, the challenged permit contains an "emergency-take" provision. This provision empowers the Port Authority, "*in emergency situations only*," to take *any* migratory bird (except bald eagles, golden eagles, or endangered or threatened species) that poses a "direct threat to human safety"—defined as a "threat of serious bodily injury or a risk to human life"—even if it is of a species not listed on the permit.[5] J.A. 1591 (emphasis in original). FWS "rarely includes an emergency take provision in its migratory bird permits," but—mindful of the "grave risks" that arise when birds congregate near aircraft—it makes an exception for airports. J.A. 1569–70.

---

superseded 2013 permit; thus, we will focus, as the District Court apparently determined was proper, on the operative 2014 permit.

[5] When the Port Authority takes a migratory bird pursuant to its emergency-take authority, it is obliged to file within 72 hours a report that (1) "include[s] the species and number of birds taken, the method of take, and a complete narrative description of the circumstances under which [it] determined an emergency existed," and (2) "discuss[es] species behaviors that created the hazard or risk being addressed; location of the birds relative to the aircraft or airport operations; duration of bird presence in the area where the emergency existed; [and] timing and amount of practical non-lethal measures attempted prior to the lethal take, as well as results." J.A. 1591.

## DISCUSSION

FOA directs its challenge at the 2014 permit's emergency-take provision.  According to FOA, 50 C.F.R. § 21.41 does not authorize FWS to issue a permit that allows the emergency take of a migratory bird irrespective of its species.  Instead, FOA argues, permit applicants like the Port Authority must "provide species[-]specific information" to FWS, and FWS may authorize the taking of only those species specifically listed on the permit.  Contending that FWS's alleged failure to abide by the requirements of § 21.41 has resulted in the Port Authority's unlawful taking of a number of migratory birds, including three snowy owls killed in December 2013, FOA asks us to invalidate the operative permit as the product of agency action that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

FOA concedes that if we read § 21.41 as it urges, situations might arise in which (1) a migratory bird, of a species not listed on the Port Authority's permit because its presence at JFK was unforeseen, poses a direct threat to an aircraft, and (2) Port Authority officials are not empowered by permit to take the bird because its species is not listed.[6]  It notes that, should such a

---

[6] FOA argued in the District Court that a separate regulation, 50 C.F.R. § 21.42, empowers FWS to authorize such takings through a depredation *order* (not a *permit*).  But § 21.42 was removed from the Code of Federal Regulations in April 2015, and at all events it never authorized the issuance of a depredation order based on migratory birds' posing a threat to aircraft.  *See* 50 C.F.R. § 21.42

8

situation come to pass, it would likely be best for Port Authority officials to take the bird notwithstanding their apparent lack of authority to do so.  FOA posits that these officials might be shielded by an affirmative defense of necessity, and at all events the government would probably decline to prosecute such conduct.

We conclude that § 21.41 does not place Port Authority officials in the untenable position of having to choose between violating federal law and deliberately ignoring serious threats to human safety.  Rather, the regulation plainly authorizes FWS to issue depredation permits that contain non-species-specific emergency-take provisions.

FWS's authority to issue depredation permits under § 21.41 is limited in certain respects by subsections (c) and (d) of that provision.  Subsection (d) provides, for instance, that a permit's duration is limited to one year.  Subsection (c) sets forth conditions common to all permits, such as the prohibition of certain hunting practices and mandatory steps for disposing of birds that have been killed; it also states that depredation permits are subject to the general conditions set forth in 50 C.F.R. Part 13.  Various provisions in Part 13, in turn, further hem in the agency's permitting authority.

(authorizing issuance of depredation orders "[u]pon the receipt of evidence clearly showing that migratory game birds have accumulated in such numbers in a particular area as to cause or about to cause serious damage to *agricultural, horticultural, and fish cultural interests*" (emphasis supplied)), *abrogated by* Migratory Bird Permits; Removal of Regulations Concerning Certain Depredation Orders, 80 Fed. Reg. 15689 (Mar. 25, 2015) (noting removal of the former 50 C.F.R. § 21.42).

*See, e.g.*, 50 C.F.R. § 13.21(a) ("No permit may be issued prior to the receipt of a written application therefor . . . ."); *id.* § 13.21(c)(1) (providing that no permit may be issued to a person who has been convicted of a felony under, *inter alia*, the MBTA, absent waiver of disqualification by the Director of FWS). But among the express limitations on FWS's discretion imposed by § 21.41(c)–(d) and Part 13, we find nothing to indicate that FWS may not issue a permit that contains an emergency-take provision. Accordingly, unless some other feature of the regulatory regime counsels otherwise, we must conclude that FWS has authority to issue permits of the type challenged here.

FOA argues that this other feature is found in 50 C.F.R. § 21.41(b). This provision states that an application for a depredation permit must contain the following information: "(1) A description of the area where depredations are occurring; (2) The nature of the crops or other interests being injured; (3) The extent of such injury; and (4) The particular species of migratory birds committing the injury." According to FOA, that regulation, when read in connection with § 21.41(c)(1)—which provides that "[p]ermittees may not kill migratory birds unless specifically authorized on the permit"—makes clear that a depredation permit may not authorize the taking of bird species not listed on the permit's face.[7]

---

[7] FOA also argues that, in its 2013 and 2014 permit applications, the Port Authority failed to comply with § 21.41(b)(4) by not identifying "[t]he particular species of migratory birds committing the injury" at JFK. FOA Br. 12 (quoting 50

10

We disagree. Section 21.41(b) by its terms governs the conduct of *applicants*, not FWS, and specifies what information must be included in the permit *application*, not the permit itself. Indeed, the provision is styled as a direct address to applicants, to whom it gives point-by-point instructions for seeking a permit. *See* 50 C.F.R. § 21.41(b) ("Submit application for depredation permits to the appropriate Regional Director (Attention: Migratory bird permit office). You can find addresses for the Regional Directors in 50 C.F.R. 2.2. Each application must contain the . . . following additional information . . . ."). FOA identifies no particular reason why we should read this subsection, contrary to its plain language, as a limit on FWS's authority to issue permits rather than as a means to ensure that applicants provide FWS with information germane to the permitting determination. *See Florez v. Callahan*, 156 F.3d 438, 444–45 (2d Cir. 1998) (a court must give effect to a regulation's plain language). Section 21.41(b) is a hopelessly slender reed on which to rest the argument that FWS is powerless to authorize the Port Authority to take migratory birds that threaten air safety.

---

C.F.R. § 21.41(b)(4)). FOA contends that snowy owls, particularly, should have been, but were not, identified in the applications. But the record shows that snowy owls *were* identified in both the 2013 and 2014 applications. *See* J.A. 350–51 (document entitled "Supplemental Information—Renewal Depredation Permit MB816581-1," dated January 25, 2013, listing "Snowy owl" as a "bird[ ] involved in [aircraft] strikes"); J.A. 1551 (document entitled "Supplemental Information—Renewal Depredation Permit MB816581-1," dated January 28, 2014, listing "Snowy owl" among "Species of migratory birds causing problems").

11

Nor does the language of § 21.41(c)(1) alter this conclusion. True, this subsection provides that permittees must "not kill migratory birds unless specifically authorized on the permit." 50 C.F.R. § 21.41(c)(1). But this is in no way inconsistent with the 2014 permit's emergency-take provision. The permit authorizes the Port Authority, in emergency situations, to "take . . . any migratory birds . . . when the migratory birds . . . are posing a direct threat to human safety" (that is, a "threat of serious bodily injury or a risk to human life"). J.A. 1591. The permit thus "specifically authorize[s]," *see* 50 C.F.R. § 21.41(c)(1), the "tak[ing]" of migratory birds if certain conditions are met—and one method of "tak[ing]" a bird is "kill[ing]" it, *see ante* note 1.

It might reasonably be argued that the term "take" embraces both lethal and non-lethal actions, *see id.*, and is therefore by itself insufficiently precise to satisfy § 21.41(c)(1)'s requirement that the permit "specifically authorize[ ]" the *killing* of migratory birds. We need not resolve this question. It is clear in context that, as used in the 2014 permit's emergency-take provision, the term contemplates (and thus implicitly authorizes) the use of lethal methods. *See* J.A. 1591 (requiring that, following an emergency taking, the Port Authority file with FWS a report including, among other elements, a description of the "timing and amount of practical non-lethal measures attempted prior to the lethal take"); *id.* (authorizing several "methods of take," including "[s]hotguns" and "lethal" traps).

12

It is therefore clear that when the Port Authority takes a migratory bird "in [an] emergency situation[ ]" because the bird "pos[es] a direct threat to human safety," J.A. 1591, the taking complies with § 21.41(c)(1)'s command that "[p]ermittees may not kill migratory birds unless specifically authorized on the permit." In arguing to the contrary, FOA reads into § 21.41(c)(1) words it does not contain, producing a new regulation that says something like, "Permittees may not kill migratory birds unless *they belong to a species* specifically *listed* on the permit." But that language does not appear in § 21.41(c)(1), and it is not our business to put it there. We accordingly reject the argument that § 21.41 prohibits FWS from issuing depredation permits containing non-species-specific emergency-take provisions.[8]

---

[8] In its reply brief, FOA argues "that FWS did not make the findings required by Section 704 of the MBTA before issuing the permit to the Port Authority." FOA Reply Br. 8. Section 704 authorizes the Secretary of the Interior, "having due regard to the zones of temperature and to the distribution, abundance, economic value, breeding habits, and times and lines of migratory flight of such birds, to determine when, to what extent, if at all, and by what means, it is compatible with the terms of the conventions to allow . . . taking . . . of any such bird . . . and to adopt suitable regulations permitting and governing the same." 16 U.S.C. § 704(a). To the extent FOA is arguing that § 704(a) limits FWS's permitting authority in ways not found in 50 C.F.R. § 21.41, it has waived the argument by failing to include it in its opening brief, which relies only on § 21.41. *See EDP Med. Comput. Sys., Inc. v. United States*, 480 F.3d 621, 625 n.1 (2d Cir. 2007). Accordingly, we do not consider it here.

13

## CONCLUSION

In sum, we hold that FWS did not run afoul of § 21.41 in issuing to the Port Authority the 2014 depredation permit.  The October 3, 2014 order of the District Court is accordingly **AFFIRMED**.