**ALLIED PRODUCTS COMPANY, Petitioner,**

v.

**FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION and Raymond J. Donovan, Secretary of Labor, Respondents.**

No. 80–7935.

United States Court of Appeals, Fifth Circuit.*

Unit B

Feb. 1, 1982.

Rehearing Denied March 9, 1982.

---

12. See note 4 *supra*.

\* Former Fifth Circuit case, Section 9(1) of Public Law 96–452–October 14, 1980.

Gilbert E. Johnson, Patricia Clotfelter, Birmingham, Ala., for petitioner.

Cynthia L. Attwood, Deputy Asst. Sol., U. S. Dept. of Labor, Arlington, Va., Ann S. Rosenthal, U. S. Dept. of Labor, Anthony J. Steinmeyer, Marleigh D. Dover Lang, Dept. of Justice, Civ. Div., Washington, D. C., for respondents.

Before HILL, Circuit Judge, SMITH **, Judge, and HENDERSON, Circuit Judge.

SMITH, Judge:

Allied Products Company (Allied) petitions for review of a decision of the Federal Mine Safety and Health Review Commis-

---

** Honorable Edward S. Smith, Judge for the    Court of claims, sitting by designation.

sion (commission) which adopted the assessment by one of the commission's administrative law judges of $25,000 in civil penalties against Allied. The penalties were assessed for violations of the Federal Mine Safety and Health Act of 1977 (act), Pub. L.No. 95–164, 91 Stat. 1290, 30 U.S.C. §§ 801 *et seq.* (Supp. III 1980), discovered by an inspection of Allied's Montevallo Lime Plant, a limestone quarry and mill in Shelby County, Alabama, following an accident there in which an Allied employee was killed. Allied raises three claims of error: (1) that there were no violations of Mine Safety and Health Administration (MSHA) regulations by the company, (2) that the act does not impose (in effect) a strict liability standard, so an employee's misconduct is a defense to liability on the part of Allied, and (3) that even if Allied is liable, the penalty assessed is excessive in light of the employee's misconduct. We find that the record supports the violations cited by MSHA and that Allied is fully liable for them, but we agree with petitioner that the penalty imposed was excessive.

Herman Shirley was an employee of Allied in 1978, working in the storeroom at the mill under the supervision of the purchasing agent and the storekeeper. His responsibilities included hauling trash from and around the storeroom to a dumping area a mile away. In this hauling work he used a pickup truck which he drove along an inclined road to the dump. The pickup truck was the only vehicle he was authorized to operate. On occasion, prior to the accident, he had used a front-end loader to do his hauling but had been reprimanded for it and specifically told never to use the vehicle again. There was also testimony that while Shirley was a reliable and conscientious worker, he could also be contrary.

. On November 25, 1978, the Saturday after Thanksgiving, though not scheduled for work, Shirley reported to the mill for duty, and was allowed to clean up the shop, bathhouses, and lunchroom. The truck he usually used to haul trash was unavailable, so, against the advice of co-workers, he used a front-end loader. This particular front-end loader was not equipped with the usual roll-over protective system (ROPS) because the ROPS had been removed so that the machine could be operated in the mill area which had low overhead clearance. Allied felt that this was a safe practice as the machine was normally used only in level areas. In any case, it is clear that it was very unsafe to take this machine on the inclined road.

The road in question was surfaced with crushed limestone, was 33 feet wide atop a dirt and clay embankment 5 feet high at one end and 30 feet at the other, and had a berm of 6 to 18 inches on the outside. The berm had washed out at points and was allowed to remain in that condition for drainage purposes.

Shirley negotiated one trip to the dump successfully, but returning from his second trip he lost control of the machine and it toppled over the embankment at one of the washed out points in the berm. Shirley was found dead, pinned beneath the overturned machine. Allied reported the accident the same day to MSHA, which investigated the incident on the following day and issued the citations which are the subject of this controversy.

A.

Allied was cited for three violations of MSHA regulations: an hydraulic fluid leak in the front-end loader which had seriously depleted its fluid reserve and caused difficult handling, in violation of 30 C.F.R. § 56.9–2 (1980); operation of the machine without a ROPS and seat belt, in violation of 30 C.F.R. § 56.9–88(a) (1980); and an inadequate berm along the road, in violation of 30 C.F.R. § 56.9–22 (1980). All of these rules are characterized in the regulations as mandatory, which means that a citation is to be issued for failure to comply with them. 30 C.F.R. § 56.1 (1980).

■ Allied does not contest that the conditions alleged existed, only that they did not affect safety and so should not have been cited. The act imposes no general requirement that a violation of MSHA regulations be found to create a safety hazard

in order for a valid citation to issue. 30 U.S.C. § 814(a).[1] If conditions existed which violated the regulations, citations were proper.

■ The findings of the agency of violations of the ROPS and berm regulations, being supported by substantial evidence, were therefore correct as a matter of law. 30 U.S.C. § 816(a). The regulation violated by the fluid leak reads:

*Mandatory.* Equipment defects *affecting safety* shall be corrected before the equipment is used. [Emphasis supplied.]

30 C.F.R. § 56.9–2. The agency specifically found that the fluid leak affected the safety of the front-end loader. As that finding is also supported by substantial evidence, the agency was correct as a matter of law. We find that violations of the act existed and were properly cited.

### B.

■ The next question is whether, given the existence of violations, Allied is responsible for them. Allied contends that if it is liable here, where significant employee misconduct existed,[2] then the act imposes strict liability on the operator. Allied vigorously argues that this is the wrong interpretation of the act.

The language of the act offers no support to Allied. It provides that any failure to comply with the regulations shall result in issuance of a citation to the *operator.* 30 U.S.C. § 814(a). There are no exceptions for fault, only harsher penalties for willful violations. *See* 30 U.S.C. § 814(d).

Section 820(a), which authorizes imposition of civil penalties, is likewise specific:

The *operator* of a coal or other mine in which a violation occurs * * * shall be assessed a civil penalty * * *. [Emphasis supplied.]

Only the operator can be fined. Also, the absence of a fault factor should be noted: "in which a violation occurs." There is no basis for reading a fault standard into the statute. We have so held recently, *Heldenfels Bros. v. Marshall*, 636 F.2d 312 (5th Cir. 1981) (unpublished opinion), and there appears no reason to depart from that holding. *See Secretary of Labor v. Ace Drilling Coal Co.*, 2 F.M.S.H.R.C. 790 (1980), *aff'd sub ·nom. Ace Drilling Coal Co. v. Federal Mine Safety & Health Review Comm'n*, 642 F.2d 440 (3d Cir. 1981) (unpublished opinion) (decided under the predecessor Federal Coal Mine Health and Safety Act of 1969, Pub.L.No. 91–173 (Coal Act)); *Pocahontas Fuel Co.*, 8 I.B.M.A. 136 (1977), *aff'd sub nom. Pocahontas Fuel Co. v. Andrus*, 590 F.2d 95 (4th Cir. 1979) (decided under Coal Act).

■ Furthermore, it is a common regulatory practice to impose a kind of strict liability on the employer as an incentive for him to take all practicable measures to ensure the workers' safety, the idea being that the employer is in a better position to make specific rules and to enforce them than the agency is. *See United States v. Park*, 421 U.S. 658, 672, 95 S.Ct. 1903, 1911, 44 L.Ed.2d 489 (1975). The legislative his-

---

**1.** Section 814(a) of 30 U.S.C. reads:

"If, upon inspection or investigation, the Secretary or his authorized representative believes that an operator of a coal or other mine subject to this chapter has violated this chapter, or any mandatory * * * regulation promulgated pursuant to this chapter, he *shall* * * * issue a citation to the operator. * * * [Emphasis supplied.]"

Compare this with § 814(d)(1), which provides that an order to withdraw men from the mine may be issued where the inspector

"* * * also finds that, while the conditions created by such violation do not cause imminent danger, such violation is of such nature as could significantly and substantially contribute to [a] * * * hazard * * *."

It is clear that a safety finding is required for a citation *only* where a withdrawal order is involved, and that is not the case here. *See also* S.Rep.No. 95–181, 95th Cong., 1st Sess. 6, 12, 30, 66, *reprinted in* [1977] U.S.Code Cong. & Ad.News 3401, 3406, 3412, 3430, 3465.

**2.** Allied claims that the administrative law judge *did not make the findings required by* 29 C.F.R. § 2700.65(a) (1980) on employee misconduct. The fact is that the judge specifically found that Allied was responsible for this misconduct by poor enforcement of its safety instructions. However, in our view of the case, this question is not relevant to the issue of liability.

tory of the act points directly to this rationale. S.Rep.No. 95–181, 95th Cong., 1st Sess. 17–18, *reprinted in* [1977] U.S.Code Cong. & Ad.News at 3417–18 (the passage is set out *infra*); H.R.Rep.No. 91–761, 91st Cong., 1st Sess. 71, *reprinted* in [1969] U.S.Code Cong. & Ad.News at 2586 (conference report on Coal Act).

The only contrary evidence petitioner points to are Occupational Safety and Health Act cases and some references to miners' duties in the legislative history of the act involved here. The Occupational Safety and Health Act is not analogous. Not only is there no legislative evidence that the act applicable here follows the Occupational Safety and Health Act, but also it must be remembered that this act covers tunnel as well as open-pit mines. Mines are far more dangerous than the ordinary workplace [3] and it would make no sense to counter the act's plain language by analogy to the less-strict Occupational Safety and Health Act standards. As to the legislative history, the passage cited by petitioner, which discusses the duty of miners to cooperate with the statute and with the mine operator in following the law, is followed immediately by this statement:

> Thus, while miners are required to comply with standards insofar as they are applicable to their own actions and conduct, * * * neither the bill, nor current law contemplates that citations and penalties be issued against miners. Operators have the final responsibilities for affording safe and healthful workplaces for miners, and therefore, have the responsibility for developing and enforcing through appropriate disciplinary measures, effective safety programs that could prevent employees from engaging in unsafe and unhealthful activity.

S.Rep.No. 95–181, *supra*, at 18, [1977] U.S. Code Cong. & Ad.News at 3418.

■ If the act or its regulations are violated, it is irrelevant whose act precipitated the violation or whether or not the violation was found to affect safety; the operator is liable. We therefore affirm the agency in finding Allied fully liable, as a matter of law, for the violations found to exist.

### C.

■ The final question for our consideration is whether the fine imposed upon Allied was excessive in the circumstances. We find that it was.

The statutory factors to be considered in fixing the amount of the penalty are:

> the operator's history of previous violations, the appropriateness of such penalty to the size of the business of the operator charged, whether the operator was negligent, the effect on the operator's ability to continue in business, the gravity of the violation, and the demonstrated good faith of the person charged in attempting to achieve rapid compliance after notification of a violation. * * *

30 U.S.C. § 820(i). The statute authorizes a maximum penalty of $10,000 for each violation, section 820(a); however, the legislative history shows how this maximum amount is to be applied.

It also should be pointed out that the $10,000 civil penalty provided in the bill refers to the maximum that can be assessed for a violation. Penalties approaching that amount would be used only in the most severe situations. The legislation, in fact, lists several factors to be considered in moderating the size of the penalty. These considerations are the gravity of the violation, the operator's previous record, the operator's good faith efforts for compliance, and the size of the mining operation. In other words, there are numerous avenues for mitigating the penalty. And, of course, due process remedies are available to the operators if they wish to appeal the penalties.

In addition, MESA [Mining Enforcement and Safety Administration] has

---

**3.** The Senate report pointedly noted that in 1973 one out of every 1,500 mine workers was killed on the job or died from work-related illness, while the same statistic for workers covered by the Occupational Safety and Health Act was one out of every 12,400 workers. S.Rep.No. 95–181, *supra* note 1, at 7, [1977] U.S.Code Cong. & Ad.News at 3407.

adopted a schedule or gradation of violations to provide consistency in imposing penalties under the Coal Act. The committee recognizes that such a schedule will be equally applicable to situations in noncoal mining and should allay unwarranted misapprehensions by operators of excessively heavy fines. As a matter of fact, the average penalty under the Coal Act is $200 per violation.

H.R.Rep.No. 95–312, 95th Cong., 1st Sess. 20 (1977).

Pursuant to the act, MSHA set out regulations, in force at the time of these violations, providing a schedule of penalty amounts based on penalty points derived from the statutory factors. 30 C.F.R. § 100.3 (1980). It is sufficient for present purposes to point out that the "penalty conversion table" begins with $2 for one penalty point and ends with $10,000 for 100 points. The MSHA proposed assessment form for Allied gives Allied a total of zero points for its violations, yet assesses the maximum penalty of $10,000 each for two of the violations and $2,000 for the third.

As an alternative to the point system, the regulations provide for "special assessment" in particularly serious situations, including fatalities. 30 C.F.R. § 100.4 (1980). The special assessment allows the agency to make its determination free from the point system. However, the regulations also require a narrative finding based on the statutory factors for a special assessment, and none is to be found in the proposed assessment form or commission opinion. Indeed, the proposed assessment form has a space for "special assessment points," and only zeroes are entered under it.

Judged by these indications alone, the assessment appears seriously excessive, but there is more. The act was deliberately structured to make liability for violations strict but to consider negligence in mitigating the penalty, where appropriate. The conference committee, which adopted the Senate bill overall, adopted the House provision for the factors to be considered in setting penalties because the House factors included negligence, whereas the Senate factors did not. S.Rep.No. 95–461, 95th Cong., 1st Sess. 58 (1977). The conference report for the predecessor Coal Act describes the rationale for this:

> Since the conference agreement provides liability for violation of the standards against the operator without regard to fault, the conference substitute also provides that the Secretary shall apply the *more appropriate negligence test,* in determining the amount of the penalty, recognizing that the operator has a high degree of care to insure the health and safety of persons in the mine.

H.R.Rep.No. 91–761, *supra,* at 71, *reprinted* in [1969] U.S.Code Cong. & Ad.News at 2586.

An operator's history of violations was also a very important factor in fixing the amount of penalties—it appeared in both the House and Senate bills—so that a company with a history of violations could be punished severely. *See* S.Rep.No. 95–181, *supra* at 43, [1977] U.S.Code Cong. & Ad. News at 3443. It would frustrate this goal entirely if the penalty amounts accelerated quickly to the maximum amount. Recognizing this, the regulations provide the following schedule of penalty points:

(c) *History of previous violations.* The history of previous violations of the Act may account for a maximum of 20 penalty points, which are derived from the following schedules:

(1) Average number of violations assessed per year in the preceding 24 months:

| Number of violations: | Penalty points |
|---|---|
| 1 to 10 | 0 |
| 11 to 20 | 1 |
| 21 to 30 | 2 |
| 31 to 40 | 3 |
| 41 to 50 | 4 |
| Over 50 | 5 |

(2) Average number of violations assessed per inspection day in the preceding 24 months:

| Violations per inspection day: | Penalty points |
|---|---|
| Under 0.3 . . . . . . . . . . . . . . | 0 |
| Over 0.3 to 0.4 . . . . . . . . . . | 1 |
| Over 0.4 to 0.5 . . . . . . . . . . | 2 |
| * * * * * | |
| Over 1.6 to 1.7 . . . . . . . . . . | 14 |
| Over 1.7 . . . . . . . . . . . . . . | 15 |

30 C.F.R. § 100.3(c). MSHA is of course in a better position than we are to determine the seriousness of a given number of prior violations, based on the total number of violations for which an average operator can be expected to be cited in the normal operation of a mine. That determination, reflected in the table printed above, is therefore entitled to great weight.

The agency action is confusing on the question of Allied's history of violations. The commission in its findings of fact found, and the record supports, that there were 12 prior citations for the berm violation between September 5, 1974, and March 30, 1977. Yet the commission's discussion of the violation and explanation of the assessment do not mention them, and the notice of proposed assessment lists zero points for prior violations. Even if all 12 violations were counted against petitioner, that would correlate to one penalty point under the regulation. Putting aside, however, the question of the fairness of assessing the maximum penalty without indicating this crucial factor (neither MSHA nor the commission made any effort to fit the prior violations data into the regulation's framework), it is clearly contrary to the regulations to impose the maximum penalty after 12 violations, nine of which occurred, according to the record, more than 24 months before the accident and so are not to be considered. 30 C.F.R. § 100.3(c).

Therefore, according to the only prior history statistics found by the commission,

Allied should be assessed zero penalty points under section 100.3(c)(1). And even the worst case, for which there is no evidence in the record, would yield only 20 points, and that does not begin to approach the penalty of $10,000.

In light of these considerations, the penalties assessed were an abuse of discretion. The amounts comport neither with the statute, nor the legislative history, nor the regulations, nor the amounts assessed in other cases cited by the parties.[4]

■ We do not doubt that these violations were serious ones, and the death of an employee is always a serious matter. The berm and ROPS rules, especially, are designed to protect employees regardless of, even in spite of, their fault or misconduct. Nor does the act apply less strictly where, as with the stockroom employee here, the employee himself is in no way engaged in "mining." However, the law does not authorize or suggest that maximum fines are to be imposed whenever a fatality occurs. Indeed, the intended historical acceleration of amounts and the mandated examination of the operator's negligence—which necessarily includes an examination of the employee's comparative negligence[5]—compel the conclusion that a maximum penalty is virtually foreclosed in this case. Even the $2,000 assessment seems excessive when it is noted that such an amount corresponds to 82 points on the point system table.[6] 30 C.F.R. § 100.3(g).

We conclude and hold, therefore, that the commission was correct in finding violations and in assigning to Allied full liability for them, but that the amounts assessed as penalties were excessive and contrary to law. The case is remanded to the commission with instructions to recalculate the penalties based on the existing record and on considerations outlined in this opinion.

4. E.g., Secretary of Labor v. Texas Lime Co., F.M.S.H.R.C. No. CENT 79–392–M (Jan. 13, 1981); Heldenfels Bros. v. Marshall, 636 F.2d 312 (5th Cir. 1981) (unpublished opinion); Secretary of Labor v. Ace Drilling Coal Co., 2 F.M.S.H.R.C. 790 (1980), aff'd sub nom. Ace Drilling Coal Co. v. Federal Mine Safety & Health Review Comm'n, 642 F.2d 440 (3d Cir. 1981) (unpublished opinion).

5. See Secretary of Labor v. Texas Lime Co., supra note 4 (employee misconduct mitigates penalty).

6. On the basis of the regulations it would appear that, excluding any special assessment, Allied's violations would amount to about 40 points each, which converts to slightly less than $200 per violation. 30 C.F.R. § 100.3.