**ROCK OF AGES CORPORATION,**
**Petitioner,**

v.

**SECRETARY OF LABOR, United**
**States Department of Labor,**

and

**Federal Mine Safety and Health Review**
**Commission, Respondents.**

No. 98–4095.

United States Court of Appeals,
Second Circuit.

Argued Nov. 19, 1998.

Decided March 3, 1999.

Henry Chajet, Patton Boggs, L.L.P., Washington, D.C. (Duane A. Siler, David Farber, Patton Boggs, L.L.P., Washington, D.C., of counsel), for Petitioner.

Robin A. Rosenbluth, U.S. Department of Labor, Office of the Solicitor, Arlington, VA (Marvin Krislov, Edward P. Clair, W. Christian Schumann, U.S. Department of Labor, Office of the Solicitor, Arlington, VA, of counsel), for Respondents.

Before: MINER, WALKER, and SACK, Circuit Judges.

MINER, Circuit Judge:

Petitioner Rock of Ages Corporation ("ROA") petitions for review of a decision of respondent Federal Mine Safety and Health Review Commission (the "Commission") affirming a decision of an administrative law judge of the Commission (the "ALJ"). The ALJ found that ROA violated four regulations promulgated under the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 801 *et seq.*, (the "Mine Act") and imposed a fine of $180,000. The Commission also affirmed the ALJ's finding that each violation was the result of an unwarrantable failure to comply with a mandatory health or safety standard. ROA challenges the Commission's interpretation and application of each regulation, as well as its findings of unwarrantable failures to comply.

For the reasons that follow, we grant review in part and deny review in part.

## BACKGROUND

### I. *Granite Quarrying*

ROA is a large granite quarrying company that owns the Smith Quarry in Vermont. At the Smith Quarry, the process of quarrying granite involves the creation of "benches," large six-sided, rectangular blocks of stone. A typical bench is 40 feet wide, 35 feet deep and 16 feet high. To begin quarrying, an operator uses an automated channel-burning torch to cut seams approximately 6 inches wide around the four sides and on the top of the bench to be quarried. After the channel-burning process is completed, workers drill a series of horizontal lift holes 1 to 2 inches wide into the base of the bench. Rows of vertical holes are then drilled into the top of the bench. After the drilling, certain horizontal lift holes are loaded with explosives in various patterns. The explosives are then detonated in a single blast. The blast is intended to separate the bench from the granite below, along the seams created by the channel burner.

After each detonation, the bench is examined to evaluate the success of the blast and to check for any undetonated explosives. If a blast is "clean," the top half of each lift hole becomes part of the removed bench and the bottom half remains in the granite to be quarried on the next level below. However, if a blast is not "clean," caprock, rock debris covering the lift holes, may remain on the surface of the unremoved granite. These intact lift holes may contain undetonated explosives. Similarly, underbreak may occur when rock beneath the lift holes cracks, leaving intact lift holes in the removed bench that may contain undetonated explosives. Because a bench may contain more and less stone than was intended to be quarried, both caprock and underbreak can occur on the same bench.

After the blast, the bench is further divided into slabs of granite and lifted out of the quarry. After an entire bench is removed, the exposed surface is cleared, scraped and inspected and then becomes the top of a future bench. Prior to 1993, with the exception of certain test blasts described below, ROA routinely utilized seismic cord, a continuous cord of explosive material, as its blasting agent. After 1993, ROA continued to use seismic cord, but conducted seven blasts uti-

lizing pyrodex, a granular explosive packed into a bag for detonation.

## II. ROA's Use of Pyrodex

During 1986 and 1987, Glenn Barrett, a representative of Hodgdon Powder Company ("Hodgdon"), a manufacturer of pyrodex, visited the Smith Quarry to demonstrate the use of pyrodex as an alternative to seismic cord. Barrett explained that pyrodex would be beneficial to ROA because it can split granite without undesirable fracturing.

During his visits, Barrett performed pyrodex test blasts, distributed literature and instructed ROA personnel on how to load the pyrodex into the lift holes. Several times, Barrett stressed the need to pressurize the lift holes to ensure proper separation of the granite. Pressurization causes the bags of pyrodex to burn sequentially after ignition of the outermost bag of pyrodex.

During the test blasts, Barrett did not provide any warnings that moisture in the lift holes could diminish the effectiveness of pyrodex. However, employees at ROA were made aware that water should be eliminated from lift holes when ROA received a scientific paper describing the use of pyrodex in January of 1993.[1]

After each test blast, ROA conducted extensive post-blast inspections; however, Barrett did not train or supervise ROA personnel in these inspections. Some of the test blasts were unsuccessful, leaving undetonated pyrodex in the lift holes ("misfires"). *See* 30 C.F.R. § 56.6000 ("Misfire [means] [t]he complete or partial failure of explosive material to detonate as planned."). Following the tests in 1986 and 1987, ROA continued to utilize seismic cord as its blasting agent, apparently discouraged by the intensive labor required to pressurize the lift holes when using pyrodex.

In January of 1993, ROA informed Barrett that it was interested in resuming experimentation with pyrodex. In response, Barrett sent information and recommended that ROA use several bags of pyrodex in each

pressurized lift hole. Between February and July of 1993, ROA utilized pyrodex as its blasting agent in the Smith Quarry. Because it was using pyrodex on an experimental basis, ROA kept detailed reports, noting the location and dimensions of the benches at which pyrodex was utilized, the number of pyrodex bags loaded into each lift hole, and the loading sequence within each bench.

## III. June 22, 1993 Blast

In preparation for a blast on June 22, 1993, ROA loaded twenty-one lift holes with 84 bags of pyrodex by placing four bags in each hole that was loaded. The loading pattern was every fourth hole. Following the blast, foreman Earl Kelty and powderman Bud Reynolds inspected the bench and reported their observations in the ROA blast report. They noted that the bench was "tight in front," meaning that the front of the bench did not separate as anticipated. Inspector Fowler of the Mine Safety and Health Administration ("MSHA") testified that neither Kelty nor Reynolds pressurized the lift holes prior to detonation. Additionally, wet weather on the day of the blast created moisture in the lift holes, interfering with ignition of the pyrodex.

Approximately seven to ten days after the June 22nd blast, derrick operator Earnest Batchelder was loading blocks of granite for removal from the quarry when he noticed four bags of unexploded pyrodex in intact lift holes. Batchelder reported the discovery to Kelty, who amended the ROA blast report to reflect that four bags of pyrodex did not ignite. After the discovery, Kelty ordered that the lift holes be washed out to neutralize any undetonated pyrodex in them; however, it is unclear whether this operation was performed. Neither Kelty nor other ROA personnel conducted any further search for misfires, such as probing under caprock. When asked during a later investigation why he did not search for additional bags of undetonated pyrodex, Kelty replied that he "forgot."

1. G. Dean Barrett, *Splitting Granite Using Pyrodex* (presented at The Society of Explosives Engineers 13th Annual Conference on Explosives and

Blasting Techniques, Feb. 1–6, 1987) (describing experiments performed during 1986 and 1987 at the Smith Quarry).

## IV. May 20, 1994 Accident

On May 20, 1994, while operating a channel burner, Michael Bassett was killed in an explosion. Unbeknownst to Bassett, his torch passed within two feet of a lift hole containing two bags of undetonated pyrodex, which were obscured by caprock. The pyrodex instantly ignited.

MSHA concluded that the fatal accident was at the site where ROA had blasted on June 22, 1993. Although bench dimensions from the June 22nd blast did not precisely match the dimensions of the accident bench, MSHA based its conclusion on the loading sequence of the lift holes. ROA reached the same conclusion in its report, which it prepared immediately after the accident.

An ensuing search for additional misfires revealed seven more lift holes containing two bags of pyrodex each. ROA discovered a total of 22 misfires on the bench out of 84 bags loaded for the June 22nd detonation. The lift holes were embedded in caprock measuring 22 inches by 30 inches and varying in thickness from one to six inches.

## V. Citations Issued

Following its accident investigation, MSHA issued four citations against ROA. MSHA charged ROA with violating (1) 30 C.F.R. § 56.6311(b), for permitting work other than work necessary to remove a misfire in the blast area; (2) 30 C.F.R. § 56.6306(g), for permitting work to resume prior to adequate post-blast inspections following the June 22nd detonation; (3) 30 C.F.R. § 56.6904, for permitting an open flame within 50 feet of explosive material; and (4) 30 C.F.R. § 56.6300(a), for inadequately training blast personnel. MSHA alleged that the violations were significant and substantial in nature and a result of ROA's "unwarrantable failure to comply" with mandatory safety and health standards.

ROA contested the citations, and an eight-day hearing was held before an ALJ. The ALJ determined that the citations and unwarrantable failure charges were justified in

light of the violations, and assessed penalties totaling $180,000. See Rock of Ages Corp. v. Secretary of Labor, Mine Safety & Health Admin., 17 F.M.S.H.R.C.1925, 1955 (1995).

## VI. Commission's Review and Remand

ROA petitioned the Commission for review of the ALJ's decision. The Commission's decision affirmed the ALJ's decision for reasons we discuss below, but vacated and remanded for reassessment of monetary penalties because it was unclear whether the ALJ had considered all of the relevant statutory criteria. See Secretary of Labor, Mine Safety & Health Admin. v. Rock of Ages Corp., 20 F.M.S.H.R.C. 106, 126 (1998). On remand, the ALJ again assessed penalties totaling $180,000. See Secretary of Labor, Mine Safety & Health Admin. v. Rock of Ages Quarries, Inc., 20 F.M.S.H.R.C. 257, 263 (1998). The Commission subsequently refused to review the later decision. See Rock of Ages Corp. v. Secretary of Labor, Mine Safety & Health Admin., 1998 WL 138602, at *1 (Mar. 23, 1998). This petition for review followed.[2]

## DISCUSSION

### I. Statutory Framework

The Mine Act was enacted to improve and promote safety and health in the nation's mines. It authorizes the Secretary of Labor (the "Secretary"), acting through the MSHA to promulgate mandatory safety and health standards for mines and to conduct regular inspections of mines. See 30 U.S.C. §§ 811, 813 (1994). The MSHA inspects each mine twice a year. Inspections are also conducted following an accident or employee complaint. See id. § 813(d). For each violation of the Mine Act or regulation promulgated thereunder, an MSHA inspector must issue a citation. See id. § 814(a). Relying on the citation, the Secretary imposes a civil penalty on the mine operator. See id. § 820(a). The inspector also must determine whether the violation is "caused by an unwarrantable fail-

---

**2.** This is the first occasion we have had to review a decision made under the provisions of the Mine Act other than decisions relating to the Black

Lung Benefits Act of 1972, 30 U.S.C. §§ 901–45 (1994).

ure to comply with such mandatory health or safety standards." *Id.* § 814(d)(1).

A designation of "unwarrantable failure" triggers potential additional civil as well as criminal liability for mine operators and their agents, *see id.* § 820(c), and can lead to "withdrawal orders." *See id.* § 814(d). A mine operator who receives two unwarrantable failure citations within ninety days is subject to withdrawal orders, which require mine operators to remove most workers from the affected area until the violation is corrected. *See id.* § 814(d)(1).

A mine operator may contest a citation before an ALJ of the Commission, which is an independent adjudicatory body. *See id.* §§ 815(d), 823. An adversely affected party may then petition for discretionary review by the entire Commission. *See id.* §§ 815, 823. A party may obtain review of a Commission decision as a matter of right in the appropriate court of appeals. *See id.* § 816(a).

## II. Standard of Review

■ "Substantial deference is to be accorded an agency when it interprets its own regulations." *Florez v. Callahan,* 156 F.3d 438, 442 (2d Cir.1998). We will reverse an agency's interpretation of its own regulation "only when that interpretation is 'plainly erroneous,' that is, where the plain language of the regulation itself or some other indication of the agency's intent at the time of promulgation compels a different result." *Id.* (citing *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994)). Where regulatory language is ambiguous, the agency's interpretation will be given effect "so long as it is reasonable, that is, so long as the interpretation sensibly conforms to the purpose and wording of the regulations." *Martin v. Occupational Safety & Health Review Comm'n,* 499 U.S. 144, 150–51, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991) (citations and quotations omitted); *see Walker Stone Co. v. Secretary of Labor,* 156

F.3d 1076, 1080 (10th Cir.1998) (applying standard to Mine Act).

On review, we will uphold factual determinations of the Commission "if supported by substantial evidence on the record considered as a whole." 30 U.S.C. § 816(a)(1); *see Secretary of Labor v. Keystone Coal Mining Corp.,* 151 F.3d 1096, 1104 (D.C.Cir.1998) ("This sensibly deferential standard of review [under the Mine Act] does not allow us to reverse reasonable findings and conclusions, even if we would have weighed the evidence differently."); *Beverly Enters., Inc. v. National Labor Relations Bd.,* 139 F.3d 135, 140 (2d Cir.1998) ("Even if a court could draw different conclusions from those drawn by the agency, that would not prevent the agency's decision from being supported by substantial evidence.") (quotation omitted); *New York State Elec. & Gas Corp. v. Secretary of Labor,* 88 F.3d 98, 104 (2d Cir.1996) (applying standard to review of Occupational Safety and Health Act).

## III. The Regulations

### A. 30 C.F.R. § 56.6311(b) [3]

In affirming the ALJ's finding of liability under 30 C.F.R. § 56.6311(b), the Commission concluded that the plain language of section 56.6311(b) "restricts the work that can be performed in an area containing misfires," *Rock of Ages Corp.,* 20 F.M.S.H.R.C. at 113, regardless of whether the mine operator has knowledge of the misfires. *See id.* at 114. In affirming the ALJ's decision that the violation was unwarrantable, the Commission concluded that ROA should have been alert to the possibility of additional misfires in light of the discovery of four bags of undetonated pyrodex following the June 22nd blast and ROA's experimental use of pyrodex. *See id.* at 115. The Commission commented that the foreman's "failure to order any meaningful search for unexploded pyrodex, ... 'evidenced a callous disregard for the hazards associated with misfires.'" *Id.* (quoting *Rock of Ages Corp.,* 17 F.M.S.H.R.C. at 1948).

---

**3.** "30 C.F.R. § 56.6311 Handling of misfires.
. . .
(b) Only work necessary to remove a misfire and protect the safety of miners engaged in the

removal shall be permitted in the affected area until the misfire is disposed of in a safe manner."

### 1. *Violation of Section 56.6311(b)*

■ ROA argues that section 56.6311(b) does not apply to unknown or hidden misfires that are only detected as a result of an accident. ROA contends that if mine operators become subject to liability for unknown misfires, the regulation would effect a standard of absolute liability whereby every accident necessarily violates the regulatory standards. Specifically, ROA asserts that subsection (b) must be interpreted in the context of section 56.6311 read in its entirety. ROA argues that the duty imposed by subsection (b) to cease all work except work necessary to remove a misfire does not arise unless and until a misfire is found in an examination required by subsection (a).[4] Because ROA was not cited for a violation under subsection (a) and there is no contention that it failed to safely dispose of *discovered* misfires, ROA contends that it could not have thereafter violated subsection (b).

■ When interpreting a statute or regulation, we are required to read that statute or regulation as a whole, *see Massachusetts v. Morash,* 490 U.S. 107, 115, 109 S.Ct. 1668, 104 L.Ed.2d 98 (1989), "since the meaning of statutory language, plain or not, depends on context." *King v. St. Vincent's Hosp.,* 502 U.S. 215, 221, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991); *see Yerdon v. Henry,* 91 F.3d 370, 376 (2d Cir.1996). It is a tenet of statutory interpretation that we should interpret words "in their aggregate [to] take their purport from the setting in which they are used." *King,* 502 U.S. at 221, 112 S.Ct. 570 (quoting *NLRB v. Federbush Co.,* 121 F.2d 954, 957 (2d Cir.1941)). Specifically, where subdivisions of a statute are grammatically interrelated they must be read together for coherence. *See American Standard, Inc. v. Crane Co.,* 510 F.2d 1043, 1058 (2d Cir.1974).

Subsection (b) is not, however, grammatically dependent on subsection (a). Indeed, ROA admits in its reply brief that "the regulation contains two plain, separate and distinct obligations." Section 56.6311 imposes several different requirements: inspections after each blast; a limit on activity in the area of a misfire; posting of certain signs;[5] and reporting of misfires.[6] While each of these safety requirements relates to misfires, none is qualified by the other. For example, a misfire would have to be reported pursuant to subsection (d) even if such a misfire were discovered through means other than an inspection under subsection (a). In contrast, other Mine Act regulations contain language limiting their applicability. For example, section 56.6310 ("Misfire waiting period") requires action only "[w]hen a misfire is suspected." Because section 56.6311 contains separate and distinct obligations, liability may attach under subsection (b) without a finding of liability under subsection (a).

Furthermore, the Commission's interpretation of the regulation is consistent with the protective purposes of the Mine Act; that is, to promote safety and health in mines. *See Energy West Mining Co. v. Federal Mine Safety & Health Review Comm'n,* 40 F.3d 457, 461 (D.C.Cir.1994) (reviewing requirements for reporting occupational injuries in light of safety and health purposes of Mine Act). To impose section 56.6311(b) liability on a mine operator regardless of whether a misfire is obvious or hidden will encourage greater vigilance when a misfire is suspected. Moreover, a contrary ruling might create an incentive for mine operators to avoid gaining knowledge of the existence of misfires. Such a result would endanger mine workers and be plainly at odds with the safety and health purposes of the Mine Act.

In further support, ROA relies on the history of section 56.6311(b). It asserts that the present language of section 56.6311(b) derives from language which provided, in pertinent part, "undetonated explosives ... found shall be disposed of safely." 30 C.F.R.

---

**4.** 30 C.F.R. § 56.6311(a) provides that "[f]aces and muck piles [free material that has been blasted] shall be examined for misfires after each blasting operation."

**5.** "(c) When a misfire cannot be disposed of safely, each approach to the area affected by the misfire shall be posted with a warning sign at a

conspicuous location to prohibit entry, and the condition shall be reported immediately to mine management."

**6.** "(d) Misfires occurring during the shift shall be reported to mine management not later than the end of the shift."

§ 56.6106 (1990) (Examination of faces and muck piles); *see* 56 Fed.Reg.2070, 2082 (1991). As the Commission noted, ROA's argument overlooks that section 56.6311(b) was also based on a second regulation, 30 C.F.R. § 56.6168 (1990) (Handling of misfires), which prohibited work in a blast area where there were misfires without any limitation such as the term "found." *See Rock of Ages Corp.*, 20 F.M.S.H.R.C. at 114 & n. 10. Although the annotation does not specifically address the knowledge requirement, the absence of the word "found" indicates that the Secretary most likely did not intend to incorporate such a requirement into section 56.6311(b).

Section 56.6311(b) imposes strict liability on mine operators for continuing work in the presence of a misfire, regardless of whether the operator has knowledge of the misfire. Other circuits have similarly held that mine operators may be held liable for violations of mandatory safety rules under the Mine Act even if they did not have knowledge of facts giving rise to the violation. *See, e.g., Stillwater Mining Co. v. Federal Mine Safety & Health Review Comm'n*, 142 F.3d 1179, 1184 (9th Cir.1998); *Freeman United Coal Mining Co. v. Federal Mine Safety & Health Review Comm'n*, 108 F.3d 358, 361–62 (D.C.Cir.1997); *Allied Prods. Co. v. Federal Mine Safety & Health Review Comm'n*, 666 F.2d 890, 893 (5th Cir.1982); *see also* 30 U.S.C. § 814(a) (requiring issuance of a citation upon violation of a mandatory health or safety standard without exception for fault).

■■■ ROA next contends that, even if the Commission's interpretation is upheld, due process prohibits enforcement of this "new" interpretation against ROA. Due process requires that regulations be sufficiently specific to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *see Upton v. SEC*, 75 F.3d 92, 98 (2d Cir.1996). Courts have recognized, however, that regulations need not achieve "meticulous specificity" and may instead embody "flexibility and reasonable breadth." *Grayned*, 408 U.S. at 110, 92 S.Ct. 2294 (quotation omitted). Accordingly, regu-

lations satisfy due process as long as a reasonably prudent person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, has fair warning of what the regulations require. *See Walker Stone*, 156 F.3d at 1083–84; *Freeman United Coal Mining*, 108 F.3d at 362. Further, an agency's interpretation of a regulation is not undeserving of deference merely because it is advanced by the agency for the first time. *See Martin*, 499 U.S. at 156, 111 S.Ct. 1171.

ROA relies on *Upton*, 75 F.3d at 98, where we held that due process prevented the Securities and Exchange Commission from enforcing its interpretation of the rule at issue. The SEC's interpretation, which was never officially published, converted commonplace acts in the industry into violations. *See id.* In contrast, there is no evidence that the Secretary has in the past permitted a mine operator to continue work in an area containing misfires.

The Commission's interpretation of the regulation, as previously noted, is consistent with the language, history and purpose of section 56.6311(b). Because the "plain language of [the standard] gives fair notice of what it requires," *Freeman United Coal Mining*, 108 F.3d at 362, ROA had sufficient notice of the conduct prohibited. *See E. Norman Peterson Marital Trust v. Commissioner*, 78 F.3d 795, 800–01 (2d Cir.1996). ROA's mining business is specifically governed by the Mine Act and the regulations promulgated thereunder. Therefore ROA should be familiar with the conditions that the regulations are meant to address, and should be aware of the regulatory objectives. *See* 30 U.S.C. § 801(g). We hold that ROA had sufficient notice of its regulatory obligations because the Commission's interpretation of section 56.6311(b) is consistent with the plain meaning of the regulation and a reasonably prudent mine operator would take the Mine Act's objectives into account when determining its responsibilities to comply with a regulation promulgated thereunder.

### 2. *Unwarrantable Failure to Comply*

■■ ROA argues that, even if the Commission's interpretation is upheld, its viola-

tion of section 56.6311(b) did not constitute an unwarrantable failure. The Commission concluded that there was an unwarrantable failure to comply with the regulation because ROA had previously discovered misfires in the area but failed to make a reasonable effort to locate and remove other misfires. *See Rock of Ages Corp.,* 20 F.M.S.H.R.C. at 115.

 An "unwarrantable failure"[7] involves "aggravated conduct, constituting more than ordinary negligence, by a mine operator in relation to a violation of the [Mine] Act." *Jim Walter Resources, Inc. v. Secretary of Labor, Mine Safety & Health Admin.,* 103 F.3d 1020, 1025 (D.C.Cir.1997) (quotation omitted). It is characterized by aggravated conduct akin to gross negligence or recklessness. *See Secretary of Labor, Mine Safety & Health Admin. v. Federal Mine Safety & Health Review Comm'n,* 111 F.3d 913, 919 (D.C.Cir.1997) [hereinafter *"Secretary of Labor"*] (the unwarrantable failure clause specifically "asks what type of conduct caused the violation"); *Buck Creek Coal, Inc. v. Federal Mine Safety & Health Admin.,* 52 F.3d 133, 136 (7th Cir.1995). Congress intended a broad reading of the term "unwarrantable failure," *see* S.Rep. No. 95–181, at 31–32 (1977), *reprinted in* 1977 U.S.C.C.A.N. 3401, 3431–32, to accomplish the Mine Act's purpose of protecting miners from safety and health hazards. *See* 30 U.S.C. § 801(a); *Secretary of Labor,* 111 F.3d at 920.

ROA contends that the Commission's finding of unwarrantable failure is predicated upon an erroneous determination that the June 22nd blast was the source of the pyrodex that later caused the fatal accident. ROA asserts that the finding is factually unsupported in light of the bench dimensions and the location of the misfired pyrodex

shots discovered following the June 22nd blast.

In its review, the Commission found "substantial evidence" to support the ALJ's ruling that the June 22nd blast site was the locus of the fatal accident. *See Rock of Ages Corp.,* 20 F.M.S.H.R.C. at 114 n. 9 (quoting *Rock of Ages Corp.,* 17 F.M.S.H.R.C. at 1939–43). The Commission regarded the following evidence as establishing the requisite culpability: (1) the blast report for the June 22nd site concludes that the four previously discovered misfires originated from that same location; (2) the accident report ROA submitted to the MSHA identified the accident site as the location of the June 22nd blast; and (3) the ROA blast report indicates that the loading pattern and sequence of the lift holes at the June 22nd blast site and the accident site were the same. *See Rock of Ages Corp.,* 20 F.M.S.H.R.C. at 114 n. 9.

We agree with the Commission that ROA's violation of section 56.6311(b) was the result of an unwarrantable failure to comply with the mandatory safety standard. *See id.* at 115. ROA's discovery of four unexploded bags of pyrodex following the June 22nd blast, particularly in light of the experimental use of pyrodex, alerted ROA to the possibility of additional misfires. Indeed, foreman Kelty recognized the need for a further search for misfires but admitted that he "forgot" to undertake a search. As the ALJ noted, misfires would not lie harmlessly in the granite, but would be exposed as the bench was further refined, or, in this case, as another bench was removed. *See Rock of Ages Corp.,* 17 F.M.S.H.R.C. at 1944–45. Although ROA conducted some post-blast inspections, the failure of Kelty and other ROA personnel to conduct a meaningful search for misfires following the discovery of the four unexploded bags of pyrodex "evidenced a callous disregard for the hazards associated with misfires." *Rock of Ages Corp.,* 20

7. 30 U.S.C. § 814(d) Findings of violations; withdrawal order

(1) If, upon any inspection of a coal or other mine, an authorized representative of the Secretary finds that there has been a violation of any mandatory health or safety standard, and if he also finds that, while the conditions created by such violation do not cause imminent danger, such violation is of such nature as

could significantly and substantially contribute to the cause and effect of a coal or other mine safety or health hazard, and if he finds such violation to be caused by an unwarrantable failure of such operator to comply with such mandatory health or safety standards, he shall include such finding in any citation given to the operator under this chapter.

F.M.S.H.R.C. at 115 (quotation omitted). Such conduct constitutes recklessness and an unwarrantable failure to comply with the regulation.

### B. 30 C.F.R. § 56.6306(g) [8]

In affirming the ALJ's finding of liability under 30 C.F.R. § 56.6306(g) the Commission determined that the phrase "a post-blast examination" created an "ongoing obligation to inspect the blast site as new granite was exposed during the quarrying process." *Id.* at 118. The Commission regarded the resumption of work as part of a continuing process that necessitated continuing inspections of the site. *See id.* at 117–18. In affirming the ALJ's decision that the violation was unwarrantable, the Commission concluded that the prior discovery of four bags of pyrodex should have alerted ROA to the possibility of additional misfires, particularly in light of ROA's experimental use of pyrodex. The Commission also relied upon the fact that ROA later discovered 40 bags of undetonated pyrodex following the fatal explosion to indicate that the earlier post-blast inspection was inadequate.

ROA argues that the Commission's determination that it violated section 56.6306(g) is erroneous because this conclusion implicates retroactive application of the regulation. Specifically, ROA argues that the blast in June of 1993 occurred before the January 31, 1994 effective date of the regulation. ROA claims improper retroactive application of the regulation for the further reason that it had already resumed work at the site prior to the effective date.

In opposition, the Secretary contends, as the Commission concluded, that the regulation requires continuing inspections for misfires as new rock is exposed. The Secretary asserts that, because the quarrying process exposes new rock on a continuing basis, there is an ongoing duty to examine for misfires "until all the material is off the top of the solid stone and the area is cleaned down."

Following this reasoning, we are asked to determine that ROA breached its duty to inspect the newly-revealed rock in the blast area after the promulgation of section 56.6306(g).

 "Retroactivity is not favored in the law." *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). Retroactive legislation "presents problems of unfairness because it [changes] . . . legitimate expectations and upset[s] settled transactions." *Eastern Enters. v. Apfel,* 524 U.S. 498, 118 S.Ct. 2131, 2151, 141 L.Ed.2d 451 (1998) (quotation omitted). Thus, "administrative rules will not be construed to have retroactive effect unless their language requires this result." *Bowen,* 488 U.S. at 208, 109 S.Ct. 468. Additionally, a statutory grant of rulemaking authority will not be construed to encompass the "power to promulgate retroactive rules unless that power is conveyed by Congress in express terms." *Id.; see, e.g.,* 30 U.S.C. § 945(c) (1994) (providing for rulemaking on a retroactive basis as related to black-lung benefit claims).

 We are prohibited from applying a regulation to conduct that took place before its enactment in the absence of clear congressional intent where the regulation would "impose new duties with respect to transactions already completed." *Landgraf v. USI Film Prods.,* 511 U.S. 244, 280, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994); *see Henderson v. Immigration & Naturalization Serv.,* 157 F.3d 106, 129–130 (2d Cir.1998), *petition for cert. filed,* 67 U.S.L.W. 3484 (Jan. 19, 1999) (No. 98–1160). The Commission's interpretation would require that which is foreclosed, namely on going inspections of a site that was blasted nearly one year before the effective date of the regulation that imposed the inspection requirement.

Regardless of whether the regulation requires a single inspection or continuing inspections, the Commission retroactively applied the regulation to impose a new

---

**8.** "30 C.F.R. § 56.6306 Loading, blasting, and security.

. . .

(g) Work shall not resume in the blast area until a post-blast examination addressing po-

tential blast-related hazards has been conducted by a person with the ability and experience to perform the examination."

requirement upon ROA in a blast site where work had resumed prior to the regulation's effective date. We find the Commission's interpretation unreasonable and grant review with respect to its liability determination and imposition of a $40,000 fine.

### C. 30 C.F.R. § 56.6904 [9]

In affirming the ALJ's determination of liability under 30 C.F.R. § 56.6904, two Commissioners concluded that a mine operator need not have actual knowledge that open flames are being used within 50 feet of explosive material to be in violation of the regulation and that the violation constituted an unwarrantable failure. *See Rock of Ages Corp.*, 20 F.M.S.H.R.C. at 119–20. Two dissenting Commissioners concluded that section 56.6904 does not apply to the conduct at issue.[10] *See id.* at 120–21 n. 17. As a result of the tied vote, the ALJ's decision stands as if affirmed. *See id.* at 123 & n. 17.

#### 1. Violation of Section 56.6904

ROA argues that the phrase "shall not be permitted" requires that the operator have actual knowledge of the presence of explosive material to be in violation of the regulation. Additionally, ROA contends that the phrase "noncombustible barriers" indicates that the regulation applies only to the storage of explosives. ROA explains that noncombustible barriers are only used for storage of explosives, and hence, the regulation's application to detonation of explosives is misplaced. In contrast, the Secretary argues that actual knowledge is not required, and that the regulation does not apply only to the storage of explosives.

■ We agree with the ALJ that the regulation applies in this instance, even ab-

sent actual knowledge of the presence of explosive material in proximity to open flames. A requirement of actual knowledge of an explosive would undermine the strict liability principles of the Mine Act. *See* 30 U.S.C. § 814(a) (providing that a citation must issue upon violation of a mandatory safety or health standard); *see, e.g., Stillwater Mining*, 142 F.3d at 1184; *Freeman United Coal Mining*, 108 F.3d at 361–62; *United States v. Jones*, 735 F.2d 785, 788 (4th Cir.1984); *Allied Prods.*, 666 F.2d at 893.

Notwithstanding strict liability, ROA had constructive knowledge of the misfires. ROA's discovery of the four misfires following the June 22nd blast put ROA on notice that its experimental use of pyrodex was causing misfires. Based on this discovery, ROA was aware that additional misfires may have been embedded in the remaining granite. However, ROA failed to investigate the possibility of additional misfires. Consequently, once channel burners came in close proximity to misfires, ROA violated section 56.6904 because it had constructive knowledge of explosive material within 50 feet of open flames.

■ Although section 56.6904 requires "noncombustible barriers" in certain situations, the requirement does not limit the regulation to the storage of explosives. As noted by the Commission, the regulation is found in the section of standards entitled "General Requirements—Surface and Underground," not the section entitled "Storage." *See Rock of Ages Corp.*, 20 F.M.S.H.R.C. at 120 n. 17. In contrast, the standards set forth in the "Storage" section are expressly limited to "stored" explosives. *See, e.g.,* 30 C.F.R. § 56.6100(a) ("Detonators

---

9. 30 C.F.R. § 56.6904 Smoking and open flames. Smoking and use of open flames shall not be permitted within 50 feet of explosive material except when separated by permanent noncombustible barriers. This standard does not apply to devices designed to ignite safety fuse or to heating devices which do not create a fire or explosion hazard.

10. The dissenting Commissioners noted that two other regulations, section 56.6311(b), Handling of misfires, and section 56.6306(g), Loading and

blasting, fully address the problem of allowing a channel-burner operator to work on a bench in the presence of unexploded pyrodex. *See Rock of Ages Corp.*, 20 F.M.S.H.R.C. at 120–21 n. 17.

The dissenting Commissioners concluded that the phrase "permanent noncombustible barriers" pertains to storage or transportation of explosives, but not misfires. *See id.* They also concluded that the regulation as a whole should only be applied to the storage or transportation of explosives. *See id.*

shall not be stored in the same magazine with other explosive material."); 30 C.F.R. § 56.6101(a) ("[a]reas surrounding storage facilities for explosive material shall be clear of rubbish"). Section 56.6904, however, does not contain language limiting its application to storage facilities.

Further, the history of this regulation indicates that the term "noncombustible barriers" originally was applied to barriers within an underground mine. Prior to a 1991 clarification, the regulation provided as follows:

> Smoking and open flames, except for the use of suitable devices for igniting safety fuse or the use of approved heating devices, shall not be permitted within 50 feet ... or within 25 feet when out of line of sight and separated by permanent noncombustible barriers in underground active workings.

30 C.F.R. § 56.6250 (1990); see 56 Fed.Reg. 2070, 2087 (1991) ("existing ... [section] 56.6250 which prohibit[s] smoking and open flames near explosive material is editorially changed for clarity"). The history of the regulation demonstrates that the prohibition extends beyond the storage of explosives.

While the facts of this case may more easily fit within the provisions of other regulations, such as sections 56.6311(b) or 56.6306(g), we think that the Commission's interpretation of section 56.6904 is reasonable and "sensibly conforms to the purpose and wording of the regulations." *Martin*, 499 U.S. at 151, 111 S.Ct. 1171 (quotation omitted); see *Florez*, 156 F.3d at 442. The Commission's interpretation is a permissible one, and we therefore uphold this interpretation. *See Udall v. Tallman*, 380 U.S. 1, 4, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965) ("The ... interpretation may not be the only one permitted by the language ... but it is quite clearly a reasonable interpretation; courts must therefore respect it.").

### 2. Unwarrantable Failure To Comply

 ROA asserts that the violation did not constitute an unwarrantable failure to

comply because ROA did not have actual or constructive knowledge of the misfires. ROA claims that because the misfires identified following the June 22nd blast were found in underbreak, they had insufficient notice of additional misfires located beneath caprock. Thus, ROA argues that the earlier discovery did not indicate a possibility of additional misfires.

There is "substantial evidence on the record" to support the Commission's determination that ROA had sufficient notice of undetonated explosives remaining within the granite to constitute constructive knowledge. 30 U.S.C. § 816(a)(1); *see Beverly Enters.*, 139 F.3d at 140. Despite its knowledge of misfires in the area, ROA continued to use open flames near the explosive material. The use of a channel burner in an area containing misfires evinces a serious lack of reasonable care by ROA, and the violation of section 56.6904 constituted an unwarrantable failure to comply with the regulation. *See Rock of Ages Corp.*, 17 F.M.S.H.R.C. at 1952.

### D. 30 C.F.R. § 56.6300(a) [11]

In affirming the ALJ's finding of liability under 30 C.F.R. § 56.6300(a), the Commission concluded that the regulation requires training in the particular type of explosive utilized, rather than generalized training in the handling of explosives. *See Rock of Ages Corp.*, 20 F.M.S.H.R.C. at 122. The Commission found substantial evidence supporting the ALJ's finding that ROA personnel, specifically Kelty and Reynolds, were not adequately trained in the use of pyrodex to direct the June 22, 1993 blast. A majority of the Commission concluded that ROA's failure to adequately train employees using pyrodex, given the extreme consequences of misfires, constituted an unwarrantable failure to comply. *See id.* at 123. The sole dissenting Commissioner argued that the deficiencies did not constitute an unwarrantable failure due to the absence of proper training by Hodgdon and the lack of intervention from MSHA, which was aware of ROA's use of

---

11. "30 C.F.R. § 56.6300 Control of blasting operations.

(a) Only persons trained and experienced in the handling and use of explosive material shall direct blasting operations and related activities."

experimental explosives. *See id.* at 123–24 n. 21.

### 1. Violation of Section 56.6300

ROA argues that the plain language of section 56.6300 does not support the Commission's expansive interpretation. Additionally, ROA asserts that the record demonstrates that "the simplicity of pyrodex use ... negates the need for additional training, other than that general explosives training and retraining which ROA routinely provided." ROA contends that its personnel were adequately trained in the use, loading and initiation of pyrodex blasts. ROA personnel received training from pyrodex's manufacturer, Hodgdon, during the 1986 and 1987 test blasts.

■■■■We agree with the Commission's interpretation that section 56.6300 requires training in the particular type of explosive utilized. The preamble to the final rule explicitly contemplates this interpretation. The preamble states as follows:

> The training and experience needed to supervise or direct blasting operations in today's mines where the technology is continually changing ... may exceed the training provided to miners who simply handle explosives under a supervisor's direction. As new explosive materials are introduced at the mine, the persons directing the blasting operations must be trained in the safe handling and use of the products. This training is normally on-the-job, provided at the mine site by a representative of the explosive manufacturer. These new products may create hazards in ... loading, blast hook-up, ... and *postblast examinations.* Training must address these areas where appropriate.

56 Fed.Reg.2070, 2079 (1991) (emphasis added). This particularity requirement avoids the "absurd result[ ]" that a mine operator could avoid liability under this section by training its workers to handle a different type of explosive than the type actually used in the mine. *Rock of Ages Corp.,* 20 F.M.S.H.R.C. at 122. Further, the interpretation takes into account a goal of the Mine Act, that is, to prevent "mine accidents." 30 U.S.C. § 801(g); *see, e.g., Freeman Coal*

*Mining Co. v. Interior Bd. of Mine Operations Appeals,* 504 F.2d 741, 744 (7th Cir. 1974) (interpreting the phrase "imminent danger" in light of health and safety purposes).

■■■ The parties dispute whether Kelty and Reynolds were trained in the use of pyrodex and, if so, the extent of their experience using the explosive. Although there was contradictory hearing testimony as to the actual training that ROA personnel received in the use of pyrodex, we conclude that the Commission's finding of liability is supported by substantial evidence. *See Rock of Ages Corp.,* 20 F.M.S.H.R.C. at 122; 30 U.S.C. § 816(a)(1). The Commission noted the following support for its finding that Kelty and Reynolds were not adequately trained in the handling and use of pyrodex: (1) Barrett's testimony that he did not recall working with either Kelty or Reynolds during the 1986 or 1987 on-site testing of pyrodex; (2) the lack of training of ROA personnel in the use of pyrodex during the six years between 1987 and 1993; (3) Barrett's testimony that he did not train ROA personnel in post-blast inspections; (4) Kelty's failure to search for additional misfires after the initial discovery of four misfires; and (5) the 26% misfire rate of pyrodex at ROA, which demonstrates inadequate training in light of the sequential ignition process. *See Rock of Ages Corp.,* 20 F.M.S.H.R.C. at 123.

### 2. Unwarrantable Failure to Comply

■■■ ROA argues that its violation of section 56.6300(a) did not constitute an unwarrantable failure because an MSHA inspector was on site during the June 22nd blast and did not issue a citation at that time. ROA further claims that pyrodex's manufacturer, Hodgdon, is liable for failing to properly train ROA personnel.

The presence of an MSHA inspector on site during the June 22nd blast does not preclude a finding that ROA personnel were inadequately trained, as the inspector may not have known of Kelty and Reynolds' lack of training in the use of pyrodex. Similarly, ROA's attempt to place the blame on Hodgdon is unavailing, because ROA could have

sought additional training from Hodgdon at any point. As ROA notes, manufacturer on-the-job training is the industry-wide accepted means of explosives training. ROA is at fault for failing to ensure that its personnel were adequately trained to use pyrodex. In light of the extreme danger posed by explosives in the quarrying industry, ROA's failure evidences a disregard for the safety of its miners and constituted an unwarrantable failure to comply with the regulation. *See id.* at 123.

## CONCLUSION

In accordance with the foregoing, we grant the petition for review of the Commission decision insofar as the Commission affirmed the decision of the ALJ interpreting and applying 30 C.F.R. § 56.6306(g) and imposing a fine for the violation. We deny the petition for review in all other respects.